### HENRY K. RAYNOLDS et al.

*v.*

### DIAMOND MILLS PAPER COMPANY et al.

[Decided May 11th, 1905.]

1. Where the stockholders of a corporation unanimously adopted a by-law placing the power to declare or withhold dividends in the board of directors, and, acting thereon, the board used the profits for expanding the business without the payment of dividends through a series of years, there was a waiver of the right of the stockholders to invoke the aid of a court of equity to compel the declaration of dividends in the absence of a showing that the policy of expansion being pursued by the board had become unreasonable.

2. Where the officers of a close manufacturing corporation, whose stock has no recognized market value, vote themselves increases in their salaries while pursuing a policy of expanding the business by the use of the profits for that purpose, to the exclusion of dividends on the stock, a court of equity has power to compel the restoration of excessive amounts so withdrawn, and to adjust the salaries to a reasonable basis.

---

*Mr. Charles H. Henderson,* for the complainants.

*Mr. Frederick T. Johnson,* for the defendants.

STEVENSON, V. C. (orally).

The bill is filed to secure two objects: One of these objects is to secure for all the stockholders of the defendant corporation, individually and severally, the benefit of a dividend, a distribution to be made to them severally and respectively of at least a portion of the accumulated profits of the corporate business. This remedy is one which is sought on behalf of each stockholder as an individual and the natural defendant in the proceeding is the corporation, the stockholders collectively, taken as a body, engaged not in individual pursuits, but in the pursuit of the corporate business for the common benefit of all. The effect of the declaration of a dividend, whether made voluntarily by a corporation through its board of directors or made compulsorily by the decree of a court of equity, is at once the establishment of a debt due from the corporation to each stockholder, which debt may be sued for in a court of law. The interests of the individual stockholder who prosecutes this sort of an action and the interests of the corporation, the stockholders collectively, who defend it, are plainly hostile. The individual stockholder is enriched and the stockholders collectively, the corporation, is, to the extent of the dividend, impoverished and crippled in its operations.

The other object of the bill is, to my mind, entirely different. It is to compel the officers and agents of the corporation who have fixed their own salaries, and drawn the amount of these salaries from the treasury of the corporation, to restore what a court of equity may find to have been an excessive amount drawn by them, an amount in excess of what they have fairly earned. If such an action is prosecuted successfully, it is manifest that the actor really is the corporation. The recovery is had for the benefit of the corporation. It is not an individual right of each stockholder which is enforced in such an action. It is a right of the stockholders, collectively, of the corporation, and the recovery is for the benefit of the stockholders collectively. It is true that in cases like this the action is instituted and prosecuted by a stockholder on his own behalf and on behalf of all other stockholders who may come into the suit; but the right which is enforced is not the individual right of the stockholder,

.as I have said, but the right of the corporation, and the reason why the suit is allowed to be brought by the individual stockholder to enforce the right of the corporation, is recognized and illustrated in a great many cases. The corporation is unable to institute this suit for the recovery of these moneys, because the defendants, who have taken the moneys and who will resist the effort to have them surrendered to the treasury of the corporation, are in full control of the corporation. A request on the part of Mr. Raynolds, for instance, in this case, made in writing to the board of directors of the defendant corporation, that they institute a suit against these officers and directors to recover back excessive salaries paid to them, manifestly would be a vain form. The only way in which the right of the corporation in this class of cases can be vindicated is by the action of the individual stockholders, who are allowed to come into court and prosecute a suit in which the corporation is nominally a defendant, but in which the corporation is recognized practically as the complainant, and the recovery is for the benefit of the corporation.

Now, we have these two, as it seems to me, radically different causes of action combined in one bill. No objection has been made to the joinder of these two causes of action. The answer meets both claims with defences. Both of these causes of action have in one or more instances, which are reported in our books, been joined, and no exception has been taken to the joinder. I find no difficulty in disposing of both of these causes of action in one suit. There is no inconvenience in dealing with them one after the other, or dealing with them together. On the contrary, there is really a great deal of advantage in joining these two different causes of action, and I am not prepared to say now, as I have not given the matter consideration, that if objection had been made to the joinder of these two causes of action by a demurrer the objection would have been sustained. A large part of the proof taken in this case bears equally upon the two causes of action; and then, too, when it comes to the decree, if—to suppose the situation which might possibly be embarrassing, certainly would be more embarrassing than any other—if the decree should go in favor of the complainant in

both causes of action, it does not appear to me that there would be any difficulty whatever in dealing fully with both causes of action, recognizing and enforcing all equities in each in a single decree. The decree would direct the proceedings necessary to be taken in order to effect a distribution of the profits, or a part of the profits, among the stockholders individually in the form of a dividend, and the same decree would go against these officers to compel them to restore any excess of salaries which they had received beyond what were fairly compensatory for the services rendered. I shall therefore take up these causes of action one after the other.

And first, the complaint in the bill that the defendant corporation and its directors are unreasonably and wrongfully withholding the profits, piling them up, instead of distributing them, or distributing a portion of them, in the form of a dividend to the stockholders. The corporation was organized in the year 1894 with a capital stock of $300,000. For some time past the entire capital stock has consisted of about $275,000 of common stock and about $25,000 of preferred stock, as I recall the figures. The preferred stock draws seven per cent. annual dividends and is a small factor in the case, and the dividend has been regularly paid. The real question relates altogether to the claim that greater dividends should be paid and should have been paid for the year 1903-1904 on the $275,000 of common stock.

In 1894 the statutory law of New Jersey in regard to the distribution of dividends by business corporations was quite different from what it is to-day. Counsel have not argued closely in order to ascertain precisely what statute controls the situation of this corporation. Counsel for complainants claims that whatever statute applies, the distribution of a substantial dividend at least should have been made and should now be made by the decree of the court.

When the corporation was formed in 1894, undoubtedly the act which applied to it and regulated the distribution of dividends was the act of 1875 as amended by the act of 1891, and that act, the act of 1891, allowed the corporation to reserve from its annual profits for a working capital an amount not

more than half of its entire capital, and directed the distribution of the residue of the profits in the form of a dividend. The act was slightly changed in 1896, but the important change was made in 1901, seven years after this corporation was formed. The act of 1901 manifestly made and intended to make a radical change in the theory of our statute in regard to the distribution of corporate dividends. This act of 1901 permits the corporation by a majority vote of the stockholders to adopt a by-law controlling the matter of the distribution of dividends, taking the place of the statutory theory, which, I think, is generally recognized as a very crude theory, a rule of thumb, and a rule that in many cases is extremely difficult of application and liable to produce great hardship. The act of 1901 provided a remedy for this situation so as to allow the matter of dividends to be regulated by a by-law adopted by a majority of the stockholders. In 1894, when this corporation was organized, by-laws were adopted, I believe unanimously, and the complainant, Mr. Raynolds, was upon the committee on by-laws which presented the by-laws, which were, as I said, unanimously adopted. The by-law then adopted, as counsel for the complainant concedes, in terms commits the distribution of profits in the form of dividends to the discretion of the directors most amply, and substitutes the statutory rule by this rule of the by-law. Now, counsel for the complainant insists that this by-law was merely a waiver of the statutory right which all the stockholders had under the act of 1891; that it was not a by-law at all: that it was a mere expression of waiver on the part of the stockholders, and that at any time it was competent for any stockholder to signify his dissent from the by-law, to withdraw his waiver and claim his statutory right to have the profits annually distributed in dividends after the limited working capital had been reserved. This by-law remained as the by-law of the company without challenge by anyone until the filing of this bill, and I think I may say that it has remained without challenge until the argument of this cause two or three weeks ago.

In 1901 the legislature passed the act to which I have referred, which expressly empowers a majority of the stockholders

of a corporation to pass this sort of a by-law. It is no longer necessary that the by-law should have back of it the unanimous consent of the stockholders. A majority of the stockholders can impose this by-law upon the corporation, this by-law committing to the discretion of the directors the entire matter of the distribution of profits in the form of dividends. There are a number of very interesting questions in regard to the statutes which I have mentioned and their relation to this corporation which I do not have to decide, because it seems to me perfectly plain that whether this by-law was valid originally or not, whether it got any additional validity by the legislation of 1901 or not, it was an expression on the part of the complainant and of all the stockholders of this corporation continuously made down to the filing of this bill of their waiver of all statutory right under the act of 1891. When the corporation was formed, as I have said, in 1894, all these stockholders had the benefit of that statute of 1891, and each stockholder might have insisted upon his statutory right to have a dividend declared annually, if profits were made pursuant to that statute and subject to the one limitation contained in that statute; but all these stockholders united and waived the right which they had full power to waive, the right which they might have enjoyed under the statute, and they said "this shall be the law of our corporation, that profits shall be distributed in the form of dividends whenever the board of directors shall deem it prudent to make a division." That is, in substance, what they said, and they kept on making that representation, holding out that waiver, and the corporation acted upon it continuously during all the period when the corporation was piling up these profits and buying new mills, and no withdrawal of the waiver was attempted by the complainants, at least until the filing of this bill. And it is a significant fact that a close examination of the bill does not disclose an intent to enforce the statutory right. It is true all the facts are set forth in the bill, and apart from any waiver on the part of the complainant, it may be claimed that the bill presents a case to which the statute applies, and therefore an express reference to the statute is not necessary; but here is the waiver, here is the by-law. No attack on the by-law is made.

The bill sets forth the facts and then contains a prayer to the effect that the accumulated profits should be divided, or so much thereof as may be deemed just, so that there is no distinct recognition in the bill or declaration in the bill that the complainant had any right under the statute of 1891. On the contrary, the bill seems to go as the argument of counsel for the complainant largely goes upon the general equitable right of the complainant, which does not depend upon any statute. There are a number of questions that are thus laid aside. I do not have to consider, for instance, whether it is competent for the legislature to pass such a statute as was passed in 1901 and make it operative upon corporations which were organized under the prior law. It may be there is a question whether the legislature can change the organic law of the incorporators, the stockholders *inter sese,* in respect of the distribution of profits. I really have given the question, if it be a question, no consideration whatever, and I am not obliged to give it any. Assuming that it is not competent for the legislature to do this thing, then another question is whether this by-law formed in 1894 by the unanimous action of the incorporators, the stockholders, before the corporation embarked in its business, amounted to a mere temporary waiver on the part of each stockholder of the right that he had or would have under the act of 1891, or whether it was a permanent waiver, and set aside and waived for all time the hard and fast statutory rule which might be beneficial to the individual stockholders in the future and might be most disastrous to them. There are situations in which the right of each stockholder under the act of 1891 to have a dividend compulsorily declared would be most inimical to the interests of all the other stockholders. And then there is another question, too, and that is, if this by-law did not by the unanimous consent of all the stockholders in 1894 displace the statutory rule, did it acquire any greater validity after it had been maintained as a by-law by the unanimous consent of all the stockholders for four years after the law was passed in 1901 which would legalize such by-law? None of these questions are up for consideration, because it is very plain to my

mind that when this bill was filed, or down to the time this bill was filed, and covering all the period during which the bill alleges a dividend should have been declared, the complainants stood assenting in the most ample manner to this by-law and by their assent waiving their statutory right. I have spoken of waiver; I might also use the word "estoppel," because the corporation acted upon this by-law. The corporation changed its situation in reliance upon this by-law, this unanimous consent of all the stockholders that dividends should not be declared under the statutory rule but only when the directors should deem it prudent to declare them, and in the year 1903, while this by-law or waiver was in full force, the corporation expended for a new mill and its equipment $133,000 and in such expenditure employed a large part of its profits. Mr. Raynolds hardly is in a position to come into this court and ask for a dividend under the statute in view of this by-law, which was his most unmistakable and solemn waiver and upon which this corporation had made this large investment not only of all its profits for that year, but of profits which it anticipated, because it was necessary for the corporation to run in debt to acquire this property.

We now come to the question whether, apart from the statute, a case is here presented in which a court of equity should intervene and take the place of the board of directors and order a dividend to be declared, create a debt due from the corporation to these stockholders as individuals, for which they can maintain actions. This work of examining the situation of a great business corporation owning large plants, mills and machinery, and with large business transactions on its hands, ·by a court of equity, in order to find out whether dividends are being unfairly and unjustly and unreasonably withheld from the stockholders, is an exceedingly difficult task. Perhaps the rule has not been correctly formulated as yet, which controls the court of chancery in the exercise of its general equity jurisdiction apart from any statute, in endeavoring to perform this work. I am fully satisfied that where ·there is no charge of bad faith, no charge of fraud, but the charge is that the directors are unreasonably refraining from declaring a dividend, that it is unfair to the

stockholders that there should not be a partial distribution, the court should not intervene if there is any room for doubt. Perhaps it would be more accurate to say the court ought not to take the place of the board of directors and control this business which is committed to their discretion, unless the case is perfectly plain. Now, in this case, there is no charge of bad faith against these directors. I think I might say that it is admitted that the managers of this corporation are men of integrity and ability, and that they have conducted the business of this corporation and built it up from a very small beginning until now it has assets of between $500,000 and $600,000, and seems to be in a very substantial financial position, with great skill. They began, as I said, in 1894, with nominally $300,000, and now they have not quite doubled the assets—not quite doubled the difference between assets and liabilities, I think. They have made large profits during the last three or four or five years, and have steadily extended, acquired more mills and more machinery, and this policy of expansion culminated in 1903 in the purchase of a new mill at Saugerties, New York, in which $133,000 was expended.

I shall not undertake to discuss in this way without having the figures and tables before me which were prepared so fully by counsel and which were so helpful to the court, the *minutiæ* of the situation of this corporation in 1893 and 1894 and at the present time, but my conclusion is that no case is presented under the general equity power of the court in which an equity judge should intervene and direct the distribution of profits in the form of dividends to these stockholders, setting aside the action or determination of the board of directors. This conclusion, however, is based upon the view which I entertain of the condition of the corporation and its business in 1903 and 1904, which is the period during which the bill alleges the dividends should have been declared, and at the present time. An entirely different conclusion might be proper and might be the only proper conclusion one year or two years from the present time. In the case of *Laurel Springs Land Co.* v. *Fougeray,* 50 *N. J. Eq.* (*5 Dick.*) 756, Mr. Justice Garrison, speaking for the court of errors and appeals, indicates that under the general

equity power of this court, the court is not without control over
a corporation where the directors roll their profits into their
business year after year until the great snowball has been
magnified twenty diameters.   The intimation is distinctly made
that a time will come when it is not fair to the stockholders,
even though the directors may be acting in good faith, to indefi-
nitely extend the corporate business.   We start here in this case
in 1894—we do not go back twenty years earlier when the
original capital was $8,000—but we start here in 1894 with a
capital of $300,000.   The rolling-in process has not yet doubled
the capital, but if this process keeps on indefinitely through
eight or ten more years, until, instead of having less than
$600,000 imperiled in this business the corporation has several
millions and desires to own almost all the paper mills in the
country, then a very different question would be presented.
There must come a time, it seems to me, when it is unreason-
able for directors to pursue a policy of expansion, but I cannot
see that the proofs indicate that that point has been reached
in this particular instance.   It is a matter of common knowl-
edge that all great industries during the last twenty years, in
order to their preservation, have been obliged to expand.   It is
a matter of common knowledge that a paper mill that was a
fortune to a man thirty or forty years ago might by itself be a
worthless asset to that man's grandson to-day.   In order to keep
that mill alive, in order to enable the business to be prosecuted
advantageously and with profit, it might be necessary now to
have four or five such mills so as to secure an enormously in-
creased product.   It is a matter of common knowledge that
thirty or forty years ago the profit on every pound or yard or
any other unit of measure was enormously greater than it is
to-day, and therefore, in order to conduct one of these large man-
ufacturing businesses profitably, the output has to be very much
greater than of old.   Well, I cannot as a single equity judge sit-
ting here, say that these gentlemen when they bought this Sau-
gerties mill in 1903 and spent their $133,000, were not doing an
act that was absolutely necessary to the preservation of the suc-
cessful business of the corporation.   There is direct evidence in
the case which indicates that that was true.   This energetic,

capable manager, this expert, Mr. Thompson, the president, the head of this great enterprise, swears positively that they would have had to curtail their business, they could not have handled their orders, without the acquisition of this mill or some other mill. Now, merely because they have nearly doubled the capital that they started out with in 1894 by constantly piling up their profits and adding them to their capital, I am not warranted in holding that dividends have unreasonably and unfairly been retained from distribution. The dividends distributed to the common stockholders, however, are exceedingly small. My recollection is that they averaged for five years less than four per cent. Beginning with 1890 during the years that have followed, this great business, in which such large gains have been made, has only yielded a little less than four per cent. to the holders of the stock. Well, it is perfectly plain that a court of equity cannot tolerate an indefinite continuation of that situation—the increasing of mills and machinery and vast expansion of this enterprise to the practical starvation of the stockholders. The situation would be very different, as counsel for the complainant very forcibly brought out in his argument and in his brief, if Mr. Raynolds' stock could be readily sold in the market and the market price of it increased as its book value increases, and these undistributed profits accumulate. If Mr. Raynolds held six hundred shares of stock in some of the banks or trust companies which have been established during the last ten years, it might make no difference to him whether dividends were paid from year to year or not. His share of these undistributed profits might be rendered to him completely from year to year in the shape of a steady increment of the market value of his stock. He might be able at any time and from time to time to realize such part of his share of the annual accumulation of profits as he might desire to have in the form of cash, by selling a few shares of his stock. But in fact in this case the complainant's stock is that of a private manufacturing corporation, a close corporation, whose stock does not appear to have any market value. There is nothing to suggest that Mr. Raynolds could have sold his stock, or any part of it, for any more money in 1904 than it would have brought in 1900. In the

case of corporations of this class sales of stock outside of the small coterie of officers and managers are generally hard to make excepting upon disadvantageous terms. I think the distinction drawn by counsel for complainant between private manufacturing corporations like this paper mill company, and banks and trust companies, and even railroad companies, the shares of which are readily salable at all times on the market, and the market price of which is directly affected by the prosperity of the corporation, ought not to be overlooked in determining whether or not a dividend is being unreasonably and improperly withheld from expectant stockholders. In my opinion it is the plain duty of the majority of the stockholders of a corporation like this paper mill company, who also constitute its entire corps of salaried officers and managers, to bear in mind that the only sure benefit to stockholders to be derived from the successful prosecution of the corporate business must come from the distribution of dividends in cash, and that the piling up of a surplus which remains undistributed may in the end go wholly to future creditors of the corporation.

On the whole case, however, especially keeping in view the expenditure in 1903 of $133,000 for the acquisition and equipment of the Saugerties mill, I do not think that a point was reached when this bill was filed at which it became the duty of this court to intervene and compel this corporation to declare a dividend for the benefit of its stockholders.

I think I have now stated the more important considerations which have led me to the conclusion that this court ought not now to set aside the judgment of these practical managers of such ability who are conducting their business apparently with great success and direct them to make a dividend, although, as I have heretofore intimated, an entirely different conclusion may be proper within a very short time.

The second cause of action set forth in the bill is the claim, made on behalf of the corporation itself, that these managers have been appropriating larger sums of money for their compensation than is just and fair. The salaries amount now, under the resolution of the board of directors of 1904, to $29,000, more than ten per cent. on the common stock—nearly ten per.

cent. on the entire stock. The president's salary in 1900 was fixed at $12,000; in March, 1904, it was raised to $15,000; the salary of the secretary in 1900 was $6,000, and in March, 1904, was raised to $9,000, an increase of fifty per cent. The salary of the treasurer, Ralph Thompson, the young man and son of the president, I shall refer to more in detail further on; it is sufficient for present purposes to say that in 1900 his salary was $1,500, and after several informal increases it was fixed, in 1904, at the time when the other salaries were raised, at $5,000. I have referred to these salaries as being received by officers of the corporation, and it may be convenient to refer to them in that way, but, of course, it is understood that these salaries have been paid by the corporation to these gentlemen as agents, as managers and workers, not as mere corporate officers. It is hardly worth while in this case to distinguish between what would be compensation to Colonel Thompson as president, presiding officer of this corporation, and to the same gentleman as the energetic manager and superintendent of the whole corporate business. It is plainly in the latter capacity that he earns what he does earn. And so with Mr. Van Gilder, the secretary. His salary of $9,000 is manifestly not earned by him as secretary to the corporation; it is earned by him as an agent of the corporation, controlling personally, almost exclusively, one very large department of the corporate business, upon which the success of the corporate business largely depends. There has been no suggestion made by counsel here that the court should undertake to set off what would be a proper salary to these gentlemen as corporation officials. The argument on both sides has gone upon the idea that the court is to consider these men as agents of the corporation and undertake to ascertain what compensation is fairly due to them for all the services of all kinds which they render.

. Now, in this case the salaries have been fixed by the directors themselves—these three salaried agents who collect $29,000 per annum for their services and control the board of directors. They are three out of five directors. As I recall it, the fifth director, Mr. Raynolds, never qualified, and the fourth director is a mere dummy holding one share of stock in order to qualify.

Messrs. Thompson, Van Gilder and Ralph Thompson, therefore, as a board of directors, or controlling the board of directors, have fixed their salaries themselves at the sums that I have mentioned. The rule is well settled that the burden is upon the directors and managers in such a case as this to satisfy the court that the salaries which they have paid themselves have been earned. The situation is absolutely different from that which I described in dealing with the claim of the stockholders to have a dividend declared. Here the court cannot avoid or evade the discharge of a duty, however difficult it may be. I must confess that it is a difficult task for this court, upon such proofs as have been taken here and upon such proofs as might have been taken if every piece of evidence possible had been adduced, to fix the just compensation which these men are entitled to receive for their services. But they cannot fix it themselves; they cannot pay themselves; they cannot be judges of their own case. They are acting very differently in awarding themselves salaries from what they are doing when determining whether dividends shall be declared or not, although, of course, they have an interest in the declaration of the dividends as stockholders. I will go back a little. The salaries were fixed in 1899, before Mr. Raynolds resigned or declined to be further elected as treasurer, and my recollection is that the salary of the president was $10,000, and the salary of Mr. Van Gilder was $4,000, and the salary of Mr. Raynolds we need not discuss. As I said before, the salary properly payable to Mr. Ralph Thompson, who is now the treasurer of the company, must be determined by itself. After these salaries were thus fixed in 1899, I think at the close of that year, in January, 1900, Mr. Raynolds, the complainant, declined to be re-elected as treasurer, and shortly after a resolution of the board of directors was passed raising the salary of Mr. Thompson, the president, to $12,000 and the salary of Mr. Van Gilder to $6,000, and fixing the salary of young Mr. Ralph Thompson, who had been brought into the company and elected treasurer, at $1,500. We now have Mr. Raynolds standing in the position of stockholder alone. He owns six hundred shares of stock, about a fifth of the entire capital. Colonel Thompson, the president, owns over half of the capital stock, and Mr. Van Gilder

five or six hundred shares. The salaried officers altogether have about four-fifths of the stock, and Mr. Raynolds and his daughter, who is associated with him as complainant and owns a few shares, together have about one-fifth. Mr. Raynolds, and presumably his daughter, became aware of the action of the board of directors in raising the salaries of the president and secretary very soon after such action was taken, and a letter is produced in which he refers to these salaries, $12,000 and $6,000, without making any objection or without making any protest. I do not recall the full tenor of the letter, but do recall distinctly that the matter was presented directly to Mr. Raynolds' mind that these salaries had been somewhat raised, and his letter, if I remember right, was a mild complaint in regard to the cessation of dividends, and perhaps he speaks disapprovingly of the salaries or of the apparent claim by the directors that they could indefinitely increase their salaries whenever they saw fit. But he refrains from making a direct protest against this increase. He does not say that it was unjust. From 1900, when these salaries were raised, until 1904, he made no protest. During that time he wrote various letters in which he complained of the insufficiency of the dividends or the cessation of dividends, and I will say right here what I had intended to say in discussing the other branch of the case, that in none of these letters does Mr. Raynolds refer to any statutory right which he had. He probably was unaware of the statute of the state, but however that may be, while he is complaining of the inaction of the directors with respect to the declaration of the dividends, he is evidently appealing to their discretion. He is not invoking any statutory rule. He thinks a dividend ought to be declared because the profits have been piled up and because the salaries are high. But coming back to the question of the salaries: In 1904 the board of directors took this action that I have referred to—of course, without conferring with Mr. Raynolds as a stockholder—in which they raised their own salaries, the president's salary to the extent of twenty-five per cent. and the secretary's salary to the extent of fifty per cent., and they fixed the salary of Ralph Thompson, as a treasurer and manager of the Bloomfield mill, at $5,000. I am unable to find evidence in this case

which sustains the action of the board of directors in making these increases. The increase altogether amounted to $8,000. The salaries were raised from $21,000 to $29,000. Well, that is a very great raise. There ought to be proofs here presented that the salaries as fixed in 1900, and in which the complainant acquiesced, were inadequate, or else that the change of situation from 1900 to 1904 warranted this very large increase. I cannot find evidence in this case to sustain such a contention. I do not think any effort was made to show that the salaries in 1900 were inadequate. They are quite substantial salaries. The burden of the argument to sustain these salaries, I think, is based upon the idea that the corporation had got richer and was able to pay larger salaries; that its business had expanded, and that therefore the services of this exceedingly energetic and able manager, Colonel Thompson, which in 1900 were compensated for by $12,000, now might receive greater recognition and a higher rate of compensation because of the greater success or increase of the business—the growth of the assets of the corporation. There is no evidence in this case, to my mind, which shows that the services rendered by these gentlemen, Mr. Thompson, the president, and Mr. Van Gilder, the secretary—these agents I prefer to call them—in 1904 were more arduous than they were in 1900, or that they called for the exercise of any greater degree of skill and experience in this business. I do not think that the increase of salaries can be justified by the theory that there was an increase in the labor, that a greater service was rendered. If there is any proof to warrant such a conclusion I have been unable to find it. It is a notorious fact that when men are building up a great business like this, with three or four great paper mills in different parts of the country, and conducting a business which shows profits of $75,000 a year, oftentimes the hardest work is done while the corporation is struggling in accumulating its capital and getting its business organized. I very much doubt whether at the present day this active manager, Colonel Thompson, this expert, can possibly render to this corporation services as valuable as those which he has rendered during years that have gone by, years of struggle, years when matters of great moment had to be decided. Colonel

Thompson had to determine in 1903 whether it was a good plan to go up to Saugerties and spend $90,000 for a mill and then equip it with $43,000 worth of machinery and improvements. It may be that no such momentous matter will have to be decided by him again, or his associates—I will not leave out Mr. Van Gilder. The time of struggle is when the most valuable services are rendered, and that is at a time when they cannot be compensated as well as at a later stage. I think, therefore, we must suppose that there was no increase of labor and no increase in the application of skill and knowledge on the part of these successful managers from 1900 to 1904 which warranted this very great increase of salaries. There is another element to be taken into consideration. I have referred to it already, and it is a matter which has been pressed upon the attention of the court with great force on behalf of these officers by their counsel in an argument from statistics, figures and comparisons which I have examined with care; and really this has been the point which largely has been contested between counsel. They have spent themselves, and very ably, too, in their arguments and proofs in showing the growth of this corporation and the expansion of its business, and the percentage of its profits allotted to stockholders and the percentage allotted to these salaried officials. I think, however, that this whole argument on behalf of the defendants is based upon a mistaken idea of the value and significance of the mere enlargement of the corporate assets. The success of a great business or manufacturing corporation is measured by what the stockholders get and not by mere accumulation of assets. Very often it would be far wiser for a manufacturer to stop with the one mill that he has and take in his profits during the few years perhaps in which profits can be made in that mill without expansion. Very often it is a fatal mistake for the manufacturer to go on and buy more mills. He may be blowing a bubble that after a time will burst. It may be that this large accumulation of profits which this corporation has turned into these new mills, this $133,000 that they put into the Saugerties mill, may all go upon liquidation, upon the failure of the business, to pay creditors, and the stockholders may never have a dollar out of it. I do not see that the

aggregation of assets in the expansion of a business venture, when all the assets are left at the risk of the business and may never come to the stockholders, affords a very sure basis for enlarging the salaries of the corporate agents and officers. The idea is that they are to be paid for accumulating these large assets and exposing them to the risk of an enlarged business; but it is not assured as yet that any success will come out of it. Failure may come out. It seems to me that it would be high time for these gentlemen to enlarge their salaries when they show that their services are so much more valuable to the corporation that the stockholders are getting a substantial interest in the profits, and until that time comes it seems to me that such increases as they have made are unwarranted. And here again regard must be had to the peculiar character of the stock of these private trading corporations, which is practically without market value as distinguished from the stock of corporations like banks and trust companies and railroad companies, the stock of which is readily salable in the market. If Mr. Raynolds' six hundred shares of stock had a market price which steadily rose from year to year as the undistributed profits of the corporation accumulated, then it would be true that the efforts of these skillful managers in accumulating corporate assets and piling up undistributed profits were directly beneficial in a pecuniary way from year to year to Mr. Raynolds. In such case Mr. Raynolds, as I have said before, could realize from year to year his fair share of the profits by the sale of his stock in small lots. But in this case, and generally in all others like it, the minority stockholders' shares cannot be sold to advantage in the market and do not increase in market value as the corporate surplus increases, and generally find a market only among the majority stockholders who are controlling the business of the corporation. The claim in such a case that the expansion of the corporate business and the accumulation of undistributed profits which are kept at the risk of the business are beneficial to every stockholder rests, in my opinion, upon rather a slender foundation. If the policy of expansion turns out to have been wisely adopted, then of course all the stockholders may finally be greatly benefited. On the other hand, if, as has

been the case in countless numbers of trading corporations, the policy of expansion leads to failure, and the distribution of the entire corporate assets among creditors to the exclusion of the stockholders, then the actual benefit received by the stockholders from the accumulation of profits seems almost to disappear from view. The only sure benefit that now occurs to me is the possibility that the minority stockholder had for making a better bargain on account of the accumulation for the sale of his stock in the very disadvantageous and limited market in which such sale might be effected. I cannot find much merit in the claim of managers of close corporations like this that their salaries ought to be increased because they are conducting the business of their employer, the business of the corporation, successfully as measured by the accumulation of profits. I incline to think that this is an instance where equity should look behind the fiction of corporate existence and, in measuring the compensation of the managers of a corporation by the success which their operations have attained, analyze the success to a large extent if not wholly from the stockholder's point of view— from the point of view of the man who cannot touch a dollar of the accumulated profits of the corporation until a dividend has been declared.

I have dealt now with the salary of the president and the treasurer, and my conclusion is that these salaries should be limited to the figures which were fixed in 1900, and which were practically assented to and accepted by Mr. Raynolds, the complainant. Before leaving this subject there is just one other matter that I meant to refer to briefly. The proofs on the part of the defendants to sustain their salaries do not seem to me to include what they might have adduced. They fixed their salaries. Of course, they come here and swear that they think they are fair. They bring a single outside expert, a Mr. McEwen, who gives some testimony, and I shall not discuss his testimony at length, but I regard his opinion as of very little weight. It seems to me that the defendants might have brought other impartial experts who could have testified as to what managers of other paper companies have been receiving.

Now, coming to the salary fixed for Mr. Ralph Thompson, which has been referred to as his salary as treasurer, it seems that this gentleman is a young man about twenty-six years of age, the son of the president, Colonel Thompson. He has a few shares of stock, I think fifty shares. He came into the company when Mr. Raynolds, who is a very aged man, retired in 1900, and was elected treasurer, and, as I have said, his salary was fixed at $1,500. Subsequently from time to time his salary was informally increased until finally, in March, 1904, I think it was—or in 1904 when this general raise was made—his salary was fixed at $5,000. Now, it is very hard to deal with this salary. No comparison can be instituted between Ralph Thompson's salary of $5,000 and Mr. Raynolds' salary in 1899, as treasurer, of $2,400. No comparison between these two things is possible. Mr. Raynolds is a very old man; he is in extreme old age. He was manifestly just able to discharge the simple duties of treasurer, sign the checks, and things of that kind. He took no part in the management of the business. This young man has been brought into the business. He is certificated as a very competent manager by his father, so far as that goes, and he has taken charge of the Bloomfield mill. He is the manager of that mill. The services that he renders to the corporation are entirely different from those rendered by Mr. Raynolds, largely in excess of any services rendered by Mr. Raynolds. Well, I am obliged to fix his salary. He was not produced as a witness. I think it was a mistake not to produce him and let him describe his own work. He seems to occupy the position of treasurer, discharging the clerical duties that pertain to that office, and his other employment is mainly that of managing the Bloomfield mill. A foreman formerly was over that mill at a salary of $4,000. He has practically displaced that expensive foreman, so that the highest salaried official or agent—employe—at that mill, I believe, only gets $1,900. Under his management the output of the mill has largely increased, according to Colonel Thompson's testimony. Still he is a young man. He is, as I said, the son of the president of this corporation, who holds more than a majority, a substantial majority, of its stock. He is placed by his father in this posi-

tion. He is pushed ahead very rapidly. Five thousand dollars is certainly a very good salary for so young a man to earn and for so young a man to qualify himself to earn in so short a period of time. I regret very much that I have not more information in the light of which I could deal with Ralph Thompson's salary. Of course, the fact that it is fixed by this board of directors is of very little moment, and the fact that his father, Colonel Thompson, justifies his action in voting for such a salary is not very helpful, and the suggestion that Colonel Thompson himself pays more than one-half of this salary because he owns more than one-half of the capital stock of the corporation also contains a fallacy. The question pure and simple is, How much ought this young man to receive for discharging the duties of treasurer and superintendent at the Bloomfield mill, and doing these other things? Counsel for the complainant insists that the salary ought not to exceed $3,500. I have hesitated in my own mind before fixing a sum between that figure and $5,000. All that I can do is to make the best guess I can, and I mean by that, with my mind open to all the evidence, make the best judgment. The determination is not final. It fixes the salary now. If Mr. Ralph Thompson complains that his salary is reduced he may console himself with the reflection that by arduous devotion to this business, by making himself more and more valuable, he will justify the board of directors, even though it may be controlled by his father, in increasing his compensation within a very short time. I have concluded on the whole that the figure to fix for Mr. Ralph Thompson's salary for the present is $4,000. The total of the salaries thus allowed, as I now figure it up, would be $22,000, and these salaries seem to me to be abundantly sufficient for the comfortable maintenance of these gentlemen and their reasonable compensation while they are exploiting this great enterprise, which apparently they have conducted in a very brilliant manner; and I want to have that distinctly understood. I am not questioning the soundness of their judgment in pursuing this policy of expansion down to the point to which they have so far pursued it. I do not intimate the slightest criticism upon the action of these gentlemen in buying that Saugerties mill

and investing in it such a large accumulation of their profits, in all $133,000. The chances may be that that will turn out in the end to have been a most wise and prudent action on the part of this corporation, saving its business from injury, rendering its business capable of expansion and increasing the annual profits. Well, if that is true, it means that substantial dividends are to be paid to the stockholders. That is what it means. The one thing that can justify this policy of expansion is ultimate gain to the stockholders. As I have said, perhaps too many times, the mere piling up of profits at the risk of the business which in the end, through bankruptcy or insolvency, are distributed to creditors means nothing to the stockholders.

These are the conclusions which I have reached. In regard to the accounting for back salaries, I do not see that that question is presented for discussion. The bill was filed in May, 1904, within two or three months after the resolution of the board was adopted raising these salaries. The officers will be required to pay back to the corporation the excess over and above the figures that I have mentioned which they have collected. The salaries must be accounted for—the excess paid—since the adoption of the resolution. The complainant was guilty of no laches. Very shortly after the adoption of this resolution in February, 1904, on April 18th, the attorney for Mr. Raynolds, as I recall the fact and the date, wrote a letter to the corporation distinctly protesting against the increase of salaries, and that protest was followed up, in May, 1904, by the filing of the bill. The result, therefore, is that the officers will be required to account for the entire increase which they have received since the increase was made in February, 1904.

In support of the conclusions which I have endeavored to set forth, I refer to the following New Jersey cases:

As to the question of a compulsory dividend: *Fougeray* v. *Cord,* 50 N. J. Eq. (5 Dick.) 185 (1892); *S. C.,* 50 N. J. Eq. (5 Dick.) 756; *Griffing* v. *Griffing Iron Co.,* 61 N. J. Eq. (16 Dick.) 269 (1901); *Trimble* v. *American Sugar Refining Co.,* 61 N. J. Eq. (16 Dick.) 340 (1901); *Stevens* v. *United States Steel Corporation,* 68 N. J. Eq. 373.

As to the salary question: *Gardner* v. *Butler, 30 N. J. Eq.* (*3 Stew.*) *702* (*1879*); *Fougeray* v. *Cord, supra; Davis* v. *Thomas & Davis Co., 63 N. J. Eq.* (*18 Dick.*) *572* (*1902*); *Hayes* v. *Pierson, 45 Atl. Rep. 1091* (*1899*); *Lillard* v. *Oil, &c., Co., 56 Atl. Rep. 254* (*1903*); *Booth* v. *Land Filling, &c., Co., 68 N. J. Eq. 536* (*1905*).