MARY KEANE TANSEY,
Plaintiff,

*vs.*

OIL PRODUCING ROYALTIES, INC., a corporation of the State of Delaware, and WILLIAM J. KENEALY,
Defendants.

*New Castle, May 13, 1957.*

474

*Henry M. Canby,* of Richards, Layton & Finger, Wilmington, and *Donald H. McLean,* Elizabeth, N. J., for plaintiff.

*Richard F. Corroon* and *Henry R. Horsey,* of Berl, Potter & Anderson, Wilmington, and *Martin B. O'Connor,* Elizabeth, N. J., for defendants.

SEITZ, Chancellor: Plaintiff, a minority stockholder, brought this action against Oil Producing Royalties, Inc., a Delaware corporation ("company"), and William J. Kenealy ("defendant"), its chief executive and principal stockholder.

Plaintiff's first claim was that the company refused without cause to transfer to her name certain stock given her by her mother. No defense was interposed to this first cause of action, and the Court ruled from the bench that the relief requested would be granted. Indeed, the refusal of the company, through the defendant, to make the transfer was most arbitrary.

Plaintiff also requested an order directing a meeting of stockholders to elect directors, there having been no such meeting since 1932. Once again, the company and the defendant had no defense to this claim. In view of my decision on plaintiff's application for a receiver this request appears to be academic.

In the derivative aspect of her action plaintiff sought to compel the defendant to account to the company for certain alleged acts of fraud and mismanagement.

Plaintiff first claims that defendant should be required to account to the company for interest paid by the company since 1946

on an $8,000 loan from the estate of the defendant's father to the company.

The burden of showing the fairness of this type of transaction is upon the corporate officer who makes a loan to his corporation. See 3 *Fletcher Cyc. of Corps.* (1947 Rev.) § 952. Although the loan was technically made by the estate, actually it was made by the defendant, the company's chief executive officer, who at the time was also the sole beneficiary and executor of his father's estate. He kept the estate open for many years and it was during this protracted period that he caused the estate to make the $8,000 loan to the company. Indeed, defendant's counsel states in his brief that the $8,000 loan from the estate, "can properly be treated for purposes of this case as due to the former (defendant)".

We thus have a situation where the defendant lent the company $8,000 and, so far as the Court can ascertain, no proper purpose for the loan from the company's point of view was shown. Indeed, defendant claims that this loan was made on a 6 per cent interest basis, yet it appears that at various times a much higher rate of interest was paid the estate. Under the circumstances of this case I view the $8,000 loan as no more than an attempt by the defendant to obtain continuing interest payments for his personal purposes. The defendant handled the entire matter himself and so it was a case of the defendant dealing with himself. The loan was improper.

I therefore conclude that the defendant is liable to account to the company for all interest payments made on the $8,000 loan. I emphasize that we are in no way here dealing with an arm's-length good faith agreement between a corporation and one of its officers.

Plaintiff next seeks to require the defendant to account for other loans made personally by defendant to the company at a rate of 6%. Once again defendant has the burden of showing the fairness of the transactions and once again it appears that he was on both sides of the transactions without any "outside" review. There were no corporate minutes with reference to the matter, nor was there any written agreement to pay interest. But even if the effect of all the

foregoing is minimized the Court must still see whether a proper purpose for the loan was demonstrated.

The best reading I can give the record shows that after the period when the company ceased to purchase oil royalties, with one minor exception, the defendant's loans were made either for the purpose of enabling the company to purchase outstanding preferred stock or furthering defendant's own financial interests. Defendant was unable to persuade me that it was appropriate to cause the company to borrow money from him in order to redeem stock. Rather I think he was doing it for his personal purposes.

■ I conclude that the defendant must account for all interest payments received since the company ceased actively to purchase oil royalties. However, these loans are not particularized in the briefs and I should be happy to consider specific loans if defendant feels the propriety of any can be established.

■ I next consider the so-called Caron transaction. The defendant's brother-in-law, Henry Caron, died in 1938 owning 50 shares of preferred stock. The defendant personally purchased this stock from the estate for the sum of $29. Defendant says this was done merely as an accommodation to the attorney for the estate. Thereafter the defendant entered into a verbal agreement with the widow whereby the company agreed to purchase the same stock from her for $5,000. This was allegedly done on the theory that she had by gift (presumably from her husband) received title to the shares. There are no documents supporting this alleged gift and Mrs. Caron was not called as a witness. It is also noteworthy that payments with interest to the widow did not commence until 1952, several years after the original "purchase" by defendant.

The record clearly shows that the defendant purchased the 50 shares at a time when it was believed by the attorney for the estate and the defendant that the shares had practically no value. Thus, a valid sale took place. Indeed, the certificates properly endorsed were delivered to the defendant at the time. I conclude that the later attempt to make it appear that the company was redeeming the shares

from Caron's widow for $5,000 was an afterthought by the defendant in an attempt to assist his relative at the expense of the company.

Defendant will be required to account to the company for all money paid by the company. Counsel will be heard as to the manner of dealing with the "apparent" unpaid balance. It was not shown factually that the defendant had a duty to purchase the preferred stock for the company. He purchased these shares years before he caused the company to commence making such purchases. Compare *Brophy v. Cities Service Co.,* 31 *Del.Ch.* 241, 70 *A.2d 5.* I therefore conclude that the defendant does not hold the shares in trust for the company.

Plaintiff next seeks to require the defendant to account in connection with the so-called S. Merchant Meeker transaction. The facts are that on June 16, 1953, according to the corporate books, the company advanced $2,175 to the estate of S. Merchant Meeker. The payment was entered on the company's books as a loan from the company to the estate. Defendant contends that check stub No. 301 shows that the sum paid was an off-set against the amounts theretofore advanced to the company by the defendant, or amounts held by the company for defendant's account. The check stub in question recites, "estate of S. Merchant Meeker charge to W. J. K."

In other words, the defendant's defense is that while it was a loan of the company's money to the Meeker estate it was in effect to be no loan at all but was to be in reality a payment of a portion of the company's existing obligation to the defendant. Defendant handled the affairs of the company in such a slipshod manner that it is impossible to determine just how much consideration should be given him in evaluating these transactions. Under all the circumstances and with the aid of equitable grace, I am inclined to consider this so-called loan to the estate as a payment by the company to the defendant on account of the money admittedly owed him. I therefore conclude that the defendant, despite the formal impropriety of his action, should not be required to account. Of course, the amount owed defendant by the company will be reduced in the amount indicated.

I next consider the so-called Roberts' transactions. The facts concerning these transactions are so bizarre as to defy adequate

characterization. It seems that the defendant advanced substantial sums of money to a builder by the name of Roberts. The defendant had already caused the Elmora and West End Building and Loan Association, of which defendant was the guiding spirit, to make substantial loans to Roberts. Roberts had also borrowed money from the defendant personally. These loans were secured by mortgages.

Commencing about February 1952, and extending until January of 1955, the defendant caused the company to advance a total of $47,430 to Roberts. Practically all of the $47,430 which was advanced to Roberts was first put into the corporate treasury by either Elmora or the defendant and was set up on the books in the company's loan payable account. The advances to Roberts were shown on the books as accounts receivable. The company received no security for the loans.

Apparently the defendant used the corporate device to continue to carry Roberts after his other credit sources had dried up. He also testified that he used the company in order to prevent his wife from knowing that he was advancing more money to Roberts. The defendant testified that in reality the money was owed directly to him and Elmora by Roberts and they had no claim against the company. He attempted to show that the company could not possibly lose because he claims that the amount of money owed to him by the company over this period was sufficient to cover the advances to Roberts. The fact is that the money actually owed defendant was not sufficient at all times to cover these obligations.

As plaintiff points out, there is not yet any actual damage to the corporation from this highly irregular practice. However, at the earliest possible moment steps must be taken to see that there is no possibility of corporate liability in connection with these transactions. The Receiver to be appointed should take immediate action in this regard.

Of course, the defendant will receive proper credit for any interest payments from Roberts to the company which actually belong to him.

Plaintiff also seeks the appointment of a receiver for the company on many grounds. It is recognized by everyone that a strong

showing must be made before a receiver for a solvent corporation will be appointed. Compare *Vale v. Atlantic Coast and Inland Corporation*, 34 *Del.Ch.* 50, 99 *A.2d* 396. What do the facts here show?

Oil Producing Royalties, Inc., the corporate defendant, was organized in this State in 1928 with an authorized capital of 5,000 shares of $100 preferred and 50,000 shares of no par common. The preferred was entitled to a 7% annual cumulative dividend and to a preference on dissolution, both as to par value and arrearages. The corporation was taken over by W. J. Kenealy, the individual defendant shortly thereafter. The defendant had purchased oil royalties in the amount of $40,000 and transferred these royalties to the company in consideration of the issuance to him of $32,000 shares of common stock.

Funds were obtained from the sale of preferred stock. Each purchaser of preferred stock also received 50 shares of common for every $1,000 invested. These common shares were in the nature of a bonus and were not issued by the company, but were transferred to the purchasers of preferred stock by Kenealy from the 32,000 shares of common originally issued to him. The company also borrowed $40-50,000 from Royalty Finance Company in 1929-30. The proceeds from the sale of the preferred stock and monies borrowed were used to purchase additional oil royalties.

Until about 1930, the company functioned as an ordinary business corporation. A considerable number of royalties were purchased, common and preferred stock were issued and dividends were paid until December 1930. While moribund during the depression, it afterwards functioned principally as a convenience for the financial operations of the defendant. No meetings of directors or officers have been held since January 1932. No financial statements were ever issued. The books were not independently audited. Officers have been changed without the formality of election by directors. The company has invested practically all its surplus funds in other enterprises dominated by the defendant or in repurchase of its own preferred stock. The corporate credit has been used to a large extent by the defendant to safeguard prior investments made by him personally or made by him on behalf of "his" Building and Loan Association.

Thus the basic purpose of the company to purchase and retain oil royalties has largely disappeared, although the company does hold royalty interests worth perhaps $20,000. The fact remains that with one minor exception, none has been purchased since about 1930. For many years the company has been largely, if not exclusively, the vehicle for the defendant's personal convenience in handling personal financial affairs. This is demonstrated by the matters discussed in connection with the accounting as well as with the other facts herein stated. Indeed, the defendant, who is the majority stockholder, stated at the trial that he had no intention of continuing the company and in fact intended to dissolve the business.

Despite defendant's protestations, there has been in reality a substantial failure of management. Since about 1932, the officers and directors were in effect largely ignored by the defendant and the requirements of the corporate form were more honored in the breach than in the observance. The company, at least on its books, made substantial loans without security and although the defendant may have had at times sufficient money owed to him by the company to cover the loans, that does not mitigate the substantial nature of the irregularity. Who is to say what would have developed had the matter of the company's rights and obligations in connection with the Meeker and Roberts matters arisen after the defendant's death?

The cumulative effect of the foregoing facts combined with the defendant's attitude with respect to the rights of preferred stockholders, his advanced age and his "strange" ideas concerning proper corporate management as evidenced by his actions and testimony, impel me to conclude in the exercise of my discretion, that the strong evidence necessary for the appointment of a receiver for a solvent corporation exists here in ample measure.

I conclude that a liquidating receiver should be appointed and counsel may discuss such appointment with the Court.

Present order on notice.