DOROTHY I. HALL ET AL., Plaintiffs Below,
Appellants,

*vs.*

JOHN S. ISAACS & SONS FARMS, INC., ET AL., Defendants Below,
Appellees.

JOHN S. ISAACS & SONS FARMS, INC., ET AL., Defendants Below,
Appellants,

*vs.*

DOROTHY I. HALL ET AL., Plaintiffs Below,
Appellees.

EARLE L. ISAACS, JR., Plaintiff Below,
Appellant,

*vs.*

JOHN S. ISAACS & SONS FARMS, INC., ET AL., Defendants Below,
Appellees,

and

DOROTHY I. HALL ET AL., Plaintiffs Below,
Appellees.

*Supreme Court, On Appeal, July 21, 1960.*

E. N. *Carpenter, II; Louis J. Finger* and *William E. Wiggin,* of Richards, Layton & Finger, Wilmington, for plaintiffs Hall.

*John VanBrunt, Jr.,* of Killoran & VanBrunt, Wilmington, for plaintiff Earle L. Isaacs, Jr.

*Samuel R. Russell,* of Morford, Young & Conaway, Wilmington, for defendants below.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, Justice: This appeal, in reality, is a consolidation for argument of an interlocutory appeal and cross-appeals from an order of the Court of Chancery of New Castle County.

The plaintiffs, Dorothy and Nelson Hall, have appealed from the denial of the claim for the appointment of liquidating receivers for the corporate defendants, and from the denial of the claim of Dorothy for an accounting and money judgment against the individual defendants. The plaintiff, Earle L. Isaacs, Jr., has appealed from the ruling of invalidity of an employment contract between him and the corporate defendants and the reservation of the question of the amount of his compensation for future decision. The corporate defendants appeal from the ruling of invalidity of the employment contract of Earle L. Isaacs, Jr., and the deferring for further hearing of the issue of the value of the services rendered by the individual defendants and Earle L. Isaacs, Jr., to the corporate defendants.

The suit below was brought by Dorothy Hall and her husband, Nelson Hall, who were joined by the Administrators of the Estate of Earle Isaacs, Sr., deceased. Together, the plaintiffs owned 50% of the stock of the four corporate defendants. The defendants are four corporations and two individuals, J. Howard Isaacs and Harry H. Isaacs, who together owned 50% of the stock of the four corporate defendants.

The suit sought the appointment of liquidating receivers of the four corporate defendants pursuant to 8 Del.C. § 226 on the ground that a stockholders' deadlock had resulted in the failure to elect directors of the corporations. An additional ground alleged for the appointment of liquidating receivers was mismanagement of the corporate affairs by the officers. Derivative relief was also sought in the form of a money judgment against the individual defendants for alleged breach of trust and misconduct in office. In addition, the plaintiff, Dorothy Hall, sought a money judgment against the individual defendants for the alleged misapplication by them of the proceeds of certain corporate bonds belonging to her.

The litigation follows an intra-family squabble which can be made understandable only by a fairly full factual statement.

The litigation involves a business enterprise which basically is the estate amassed by John S. Isaacs, late of Sussex County, Delaware. The estate consists of lands and equipment used in a large scale farming operation; residential real estate rented to the public; a cold storage plant, and other unrelated assets having substantial value.

The farming operation is conducted upon approximately 8000 acres of land located near Ellendale in Sussex County, Delaware. This operation consists of raising annual crops; raising and selling approximately one million chickens annually; the annual conditioning for sale of 300 beef cattle, 150 sheep and 100 hogs; the periodic operation of a cannery with a daily capacity of 3000 cans of food-stuffs; the periodic operation of a sawmill, and the operation of a dozen broiler houses with an annual capacity of one million chicks. A long list of equipment of varied types is owned to carry on this large scale enterprise.

The cold storage plant is located in Georgetown, Delaware and has a capacity of 7,000,000 tons. The plant, itself, occupies an entire city block.

The investment and unrelated property of the estate consists of dwelling houses scattered throughout Sussex County rented to the public, and securities having a total market value in 1955 in excess of $400,000.

All of this enterprise was amassed and owned by John S. Isaacs. By 1942 his taxable income from the enterprise had understandably reached the higher income tax brackets. Accordingly, on January 1, 1943 he formed a partnership consisting of himself, his wife, Mary C. Isaacs, and their four children, Earle (now deceased), Howard, Harry and Dorothy, the wife of Nelson Hall, to operate the enterprise. Under the partnership agreement, Mrs. Isaacs and Dorothy were each to receive 10% of the profits and each of the other four partners were to receive 20%. On January 1, 1944 the partnership

agreement was amended to provide for an equal distribution of profits among the six parties.

The partnership thereafter operated the enterprise, divided the profits and the partners reported their taxable income under this arrangement. The taxes on the partners' income thus reported were actually paid from the partnership's funds. In 1947 the Federal Internal Revenue Service challenged the validity of the partnership for tax purposes and assessed additional tax by reason of the understatement of partnership income. The resulting claim for increased tax assessment was finally settled in 1954 by the disallowance of Dorothy's status as a partner and the addition of her percentage of partnership income to the income of her father and mother. Substantial assessments for understatement of partnership income were made against the remaining partners. As part of the settlement Dorothy received a tax refund which, with interest amount to about $42,000. With her consent this was applied to the tax liability of her father.

As of March 1, 1949, some five years before the final settlement of the income tax matter, the partnership was dissolved and two of the four corporate defendants organized. First, John S. Isaacs & Sons, Inc. (hereafter Sons) was organized and to it was transferred all of the farm land and buildings. Second, John S. Isaacs & Sons Farms, Inc. (hereafter Farms) was organized and to it was transferred all of the farm and factory equipment. Thereafter, Sons leased to Farms at an annual rental of $33,000 the farm land and buildings. All of the stock of these two corporations was ultimately issued in equal shares to the four children, Earle, Howard, Harry and Dorothy, except that Dorothy's shares in Farms were issued in the name of her husband, Nelson Hall.

John S. Isaacs kept the balance of his assets as his individual property and, thereafter, until his death on July 29, 1950, carried on individually the cold storage business and rented the dwelling houses owned by him. By his will, with the exception of a legacy to his wife, he bequeathed his estate in equal shares to his four children who, from his death until March 1, 1952, carried on the cold storage business as a partnership.

At his death, John S. Isaacs owed Farms $341,181.84 while Farms owed him $55,689.94. The Estate of John S. Isaacs transferred to Farms certain securities, assets of the estate, at their appraised value of $346,875.67 as payment of his indebtedness to Farms. This transfer was made subject to a Federal tax lien which had been imposed by reason of the tax assessment against the Estate of John S. Isaacs. The balance remaining to the credit of the estate was added to the amount owed by Farms to John S. Isaacs and was thereafter carried on the books of Farms as an open account in the amount of $61,383.77 to the credit of the four children.

On March 1, 1952 John S. Isaacs & Sons Realty Co., Inc. (hereafter Realty) was organized and the land, cold storage plant, and dwelling houses were transferred to it. At the same time, John S. Isaacs & Sons Storage, Ins. (hereafter Cold Storage) was organized and the office and shop equipment, repair parts, supplies and intangibles were transferred to it. Thereafter, Realty leased to Cold Storage at a fixed rental of $39,000 the land and buildings owned by it. The stock of Realty and Cold Storage was issued to the four children in equal shares. Each stockholder, in addition, received a bond in the amount of $34,638.52 from Realty and a bond in the amount of $46,246.80 from Cold Storage.

There is a dispute among the parties as to the purpose for which these bonds were issued. Dorothy and Nelson maintained that the bonds were intended as a device for the payment of money as interest and principal to the stockholders free of corporate income tax. Howard and Harry, on the other hand, maintain that the bonds were issued on the advice of their accountant as a method of accumulating money free of corporate tax to be ultimately applied against the tax liability arising from the tax assessment against the John S. Isaacs partnership. Whatever the underlying purpose, it is apparent that the bonds were issued on the advice of the accountant, presumably for tax reasons.

Thereafter, the enterprise was carried on by Earle, Howard, Harry and Nelson Hall. Each drew a salary of $12,000. Each had an expense allowance of $50 per week; each had the use of a corporate automobile, free gasoline, free use of the cold storage plant, and

the right to take any foodstuffs desired for the use of his family. Each had the privilege of keeping 15 cattle and 6 hogs on the farms at corporate expense.

It appears that all four worked hard and that tensions grew among them. In November, 1952, Nelson Hall resigned as a salaried employee. In January, 1953, Earle, Howard and Harry raised their respective salaries to $18,000. Tension, however, continued and in the spring of 1953 Earle withdrew from active participation and, on March 11, 1954, was killed in an automobile accident. His interest thereafter was represented by his widow and son, Earle, Jr., as Administrators. In March, 1954, Howard and Harry, who have continued to operate the business, increased their salaries to $27,000. Since the incorporation of the business—in reality, as the Vice-Chancellor described it, an incorporated partnership—no dividends have been paid the stockholders.

Since January 19, 1950 no directors of Farms and Sons have been elected. No directors of Realty and Cold Storage have ever been elected. At a stockholders meeting ordered by the Court of Chancery no directors were elected for any of the companies because of a deadlock among the stockholders arising from the fact that each contesting group voted its 50% stock interest for different slates of directors.

Following the meeting this suit was filed for the appointment of liquidating receivers on the ground, *inter alia,* that a deadlock existing among stockholders, receivers should be appointed pursuant to 8 *Del.C.* § 226.

The foregoing in broad outline is the factual situation of this family squabble. Where necessary, additional facts will be referred to in our discussion of the various questions presented to us for decision. We take up initially the question of the appointment of liquidating receivers.

The first ground urged by plaintiffs is the existence of a deadlock among the stockholders. Following the filing of this action, the individual defendants caused the corporations to enter into an employment contract with Earle, Jr. At Earle, Jr.'s insistence, the corporations also agreed to purchase, at her request, the stock of his mother,

the widow of Earle, Sr., deceased. The 25% stock interest, originally the property of Earle, Sr., thus deserted the plaintiffs Hall and took the side of the individual defendants. Howard and Harry thereupon argued that the stockholders' deadlock had been broken. The Vice-Chancellor held, however, the agreements to be invalid and concluded that in equity the stockholders' deadlock had not been broken. He, accordingly, ordered a new election which he, himself, conducted in the guise of special master.

At the new election a majority of stock of each of the corporations was voted for the Howard-Harry slate of directors by the addition to their one-half interest of the stock received by Earle, Jr., as an heir of his father, the Estate of Earle, Sr., in the interim having been settled and the assets distributed. The Vice-Chancellor held that while Earle, Jr.'s employment contract was invalid, he could nevertheless vote his stock as he wished irrespective of his motive in so doing, and that the deadlock had been broken.

From this ruling the plaintiffs Hall appealed. Since then, however, Howard and Harry have personally purchased the stock inherited by the widow of Earle, Sr. The question of stockholders' deadlock therefore, now appears to be moot, since Howard and Harry now own in their own names a majority of the stock of the four corporate defendants. There is, therefore, nothing for us to consider under this heading in the light of the present facts. No receiver may be appointed, therefore, under 8 *Del.C.* § 226.

The second ground urged by plaintiffs for the appointment of a receiver is alleged mismanagement of the corporate enterprise by Howard and Harry. The acts of mismanagement alleged by plaintiffs are the paying of excessive salaries and incidental benefits to Howard, Harry and Earle, Jr.; the refusal to keep proper corporate records for the inspection of stockholders; the policy of Howard and Harry to refuse to pay dividends but to draw profits from the enterprise solely by the payment of salaries; the use of corporate money to bribe Earle, Jr. to suport them rather than the Halls; and the misuse by Howard and Harry of the proceeds of Dorothy's bonds.

These corporations for which plaintiffs ask the appointment of liquidating receivers are all solvent. Under some circumstances courts of equity will appoint liquidating receivers for solvent corporations, but the power to do so is always exercised with great restraint and only upon a showing of gross mismanagement, positive misconduct by the corporate officers, breach of trust, or extreme circumstances showing imminent danger of great loss to the corporation which, otherwise, cannot be prevented. *Thoroughgood v. Georgetown Water Co.*, 9 *Del.Ch.* 84, 77 *A.* 720; 43 *A.L.R.* 242; *Vale v. Atlantic Coast and Inland Corp.*, 34 *Del.Ch.* 50, 99 *A.2d* 396; *Zuchowski v. Boxwood Coal Corp.*, 33 *Del.Ch.* 331, 93 *A.2d* 119. Mere dissension among corporate stockholders seldom, if ever, justifies the appointment of a receiver for a solvent corporation. The minority's remedy is withdrawal from the corporate enterprise by the sale of its stock. *Drob v. National Memorial Park, Inc.*, 28 *Del.Ch.* 254, 41 *A.2d* 589.

Plaintiffs rely upon *Tansey v. Oil Producing Royalties*, 36 *Del. Ch.* 472, 133 *A.2d* 141, in which a receiver was appointed for a solvent corporation. In that case the proof was that there had been a substantial failure of management, the managing officer had utilized the corporate assets for his own benefit, and, furthermore, he contemplated the total abandonment of the corporate enterprise. It was thus held that the appointment of a receiver was necessary to prevent imminent loss to the corporation.

In the case of the corporations at bar no comparable situation exists. The corporations are solvent and show annual profits. The Vice-Chancellor found the fact to be that they are well and efficiently run by the present management. The corporate properties are kept in good condition—indeed, they are probably in better condition than when the corporations commenced operations. We think the proof supports the Vice-Chancellor's conclusion that there is no showing at all of mismanagement on the part of officers, the two individual defendants.

The charge that the defendants caused the corporations to pay them excessive salaries and incidental benefits, and the charge of

bribery of Earle, Jr. with corporate funds through the medium of an employment contract, stand in the present record as unresolved issues, since the Vice-Chancellor reserved decision on the points until after a further hearing to develop the facts necessary to determine them. Obviously, therefore, it is premature to ask this court to decide these issues. Indeed there is nothing in the record which would enable us to decide them.

With respect to the charge that inadequate books and records are kept which prevents the plaintiffs from ascertaining the value of their shares, it appears that the record keeping of the companies conforms to the system initiated at the time when all of the now divergent owners were working together harmoniously within the companies. It further appears that the method of keeping the books conforms to the requirements of the Internal Revenue Service. All of these records are available for inspection by the plaintiffs and, apparently, were produced at the hearing before the Vice-Chancellor. The main complaint of the plaintiffs under this heading is that they have been denied the right to make an independent audit of the corporations to determine their true value and earnings. This fact, however, alone, does not justify the stringent remedy of receivership. *Lichens Co. v. Standard Commercial Tobacco Co.*, 28 *Del.Ch.* 220, 40 *A.2d* 447, and see *Paulman v. Kritzer Radiant Coils, Inc.*, 37 *Del.Ch.* 348, 143 *A.2d* 272. Furthermore, the plaintiffs are not seeking an appraisal of their stock in this proceeding. If the suit were one to force the payment of dividends there can be no doubt of the power of the Court of Chancery to order an audit if one is required. That is not this case, however.

Plaintiffs also claim that the policy of Howard and Harry to pay out profits of the enterprise in the form of salaries and to refuse to pay any dividends leave them without remedy, unless a receiver is appointed. The argument is subject to several infirmities at this stage of the proceedings. There is no showing in this record that during the period the corporation had any funds available for the payment of dividends. It is, of course, axiomatic that dividends may not be paid absent a legal source for their payment. Furthermore, one of the factual matters in dispute is as to the existence of

the non-dividend policy complained of since Howard and Harry maintain, at least on the briefs of counsel, that if earnings justify it, dividends will be declared.

Furthermore, it certainly is not without some bearing on the point that through the medium of the corporations total tax liabilities of about $550,000 have been paid. It is true that this liabilty was composed of assessments against the Estate of John S. Isaacs, the children (with the exception of Dorothy), and the corporations. While not the obligation directly of the corporations, the securities transferred to them from the Isaacs Estate were transferred subject to a Federal tax lien, and it is equally true, as found by the Vice-Chancellor, that Howard and Harry caused the corporations to pay off the tax obligations in accordance with their tax accountant's advice and in the belief that in so doing they were acting in the best interests of the enterprise, which, in the last analysis, meant, the four children. Whether or not it was proper for corporate funds to be used to pay off the individual assessments made against Earle, Sr., Howard and Harry as former partners, on the theory that such assessments were in reality partnership obligations, might well be an issue in an action to compel the payment of dividends, but it is not an issue in the present action.

Finally, the Vice-Chancellor has reserved for further hearing the charge of excessive payment of salaries and incidental benefits. This obviously is pertinent to the dividend payment question. One result of this further hearing undoubtedly will be to establish the facts with more preciseness as to moneys available for the payment of dividends. At any rate, we think, at least in the light of this record, that failure *per se* to pay any dividends is not sufficient ground to cause the Chancellor, in his discretion, to appoint a receiver.

If the plaintiffs are able to establish as the fact that money is available in the corporations which should be paid out in dividends, and that the management wilfully refuses to do so in order to freeze out the minority interest, then upon such a showing the extraordinary relief of a direction to management to declare and pay a dividend might become available to them. Cf. *Dodge v. Ford Motor Co.,* 204

*Mich.* 459, 170 *N.W.* 668, 3 *A.L.R.* 413; *Raynolds v. Diamond Mills Paper Co.,* 69 *N.J.Eq.* 299, 60 *A.* 941; 11 *Fletcher, Cyclopedia Corporations,* § 5325. In any event, however, the refusal to declare dividends seem not to be ground for the appointment of liquidating receivers.

■ The final ground urged for the appointment of a receiver is the alleged misuse of Dorothy's bonds without her consent, to defray a portion of the tax liability. Whether or not the application of the proceeds of these bonds to the tax claim has subjected Howard and Harry to a suit by Dorothy for misappropriation is one matter, but, irrespective of that, we do not think, in view of the Vice-Chancellor's holding of *bona fide* purpose, that it is evidence of mismanagement of the corporations so as to require the remedy of receivership.

We are of the opinion that the Vice-Chancellor was correct in refusing to appoint receivers for these corporations.

We turn now to the claim asserted by Dorothy for a money judgment against Howard and Harry for alleged misappropriation of the proceeds of her bonds. It will be recalled that upon the organization of Realty and Cold Storage, each of the four Isaacs children received, in addition to their 25% stock interest, two corporate bonds, totaling approximately $81,000. These bonds, all are agreed, were issued on the advice of a tax accountant who conceived of them as a way to draw from the corporations money by redeeming the bonds without subjecting the recipients to an income tax on a dividend. Dorothy claims this was the sole purpose of the bonds, while Howard and Harry contend that a further purpose existed, viz., to use the money so drawn off for the discharge of the tax liability on the Isaacs Estate.

■ ■ This issue is as yet undetermined, for the Vice-Chancellor declined to take jurisdiction since Dorothy had, and still has pending, an action at law for this claim. We think, however, that it was error for the Vice-Chancellor to refuse to decide the issue and to leave the parties to retry it at law. We are of this opinion because of the principle that once equity acquires jurisdiction over a dispute,

it will proceed to adjudicate all related matters in order to put the controversy at rest, even though it would not have jurisdiction over the particular matter by way of independent suit. *Scotton v. Wright,* 13 *Del.Ch.* 214, 117 *A.* 131 *affirmed* 13 *Del.Ch.* 402, 121 *A.* 69, 31 *A.L.R.* 1162; *Tull v. Turek,* 38 *Del.Ch.* 182, 147 *A.2d* 658. We think this claim is sufficiently related to the matter over which Chancery had admitted jurisdiction as to bring the rule into play.

A mandate will, accordingly, issue affirming the order of the Vice-Chancellor appealed from except that portion refusing to take jurisdiction of the claim of Dorothy for a money judgment against Howard and Harry with directions to finally decide that claim.

This leaves for decision the cross-appeals seeking reversal of the Vice-Chancellor's reservation for future determination of the charge of the excessive compensation of the officers. The argument is based upon the Vice-Chancellor's holding that in so far as the appointment of a receiver was concerned, he found no excessive compensation paid to the officers. From this, the argument is built that he necessarily, therefore, decided the question of excessive salary payments complained of. We have difficulty in following the argument since the two issues are not necessarily related. For example, salaries might be excessive and, at the same time, not an example of gross abuse by the officers of their positions of control. In any event, we are of the opinion that the Vice-Chancellor has not decided the question.

It is also argued that the salary payments have been ratified by the stockholders. It is sought to supplement the record to show this fact. Although all parties are apparently agreed that the record before us may be supplemented, we do not pass on the propriety of so doing for the reason that on remand and further hearing before the Vice-Chancellor the question of ratification may be presented to him and decided.

We affirm that portion of the Vice-Chancellor's order reserving for further hearing the question of the payment of excessive compensations.