**THEODORA HOLDING CORPORATION,**
**Plaintiff,**

v.

**Girard B. HENDERSON, Bengt Ljunggren and Alexander Dawson, Inc., Defendants.**

Court of Chancery of Delaware.

New Castle.

Sept. 18, 1969.

---

Richard F. Corroon, of Potter, Anderson & Corroon, Wilmington, and Milton Kunen of Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

Robert H. Richards, Jr., of Richards, Layton & Finger, Wilmington, and John R. Hupper, of Cravath, Swaine & Moore, New York City, for defendant Girard B. Henderson.

W. Laird Stabler, Jr., Wilmington, for defendant Alexander Dawson, Inc.

MARVEL, Vice Chancellor:

Plaintiff, which was formed in May of 1967 by the defendant Girard B. Henderson's former wife, Theodora G. Henderson, is the holder of record of 11,000 of the 40,500 issued and outstanding shares of common stock of the defendant Alexander Dawson, Inc. It sues derivatively as well as on its own behalf for an accounting by the individual defendants for the losses allegedly sustained by the corporate defendant and the concomitant improper gains allegedly received by the individual defendants as a result of certain transactions of which plaintiff complains. However, the basic relief sought by plaintiff after trial is the appointment of a liquidating receiver for the corporate defendant, such application being based on the alleged wrongs suffered by the corporate defendant at the hands of the individual defendants, which wrongs, according to plaintiff, if permitted to continue, threaten the very existence of such corporation.

As of September 30, 1968, Theodora G. Henderson, in addition to her interest in

the plaintiff corporation, was the holder of the following shares of preferred stock of the corporate defendant, namely, 3,000 of first preferred, 12,000 of second preferred, and 22,000 of third preferred. She continues to receive dividends on such shares. Prior to plaintiff's formation in 1967 Mrs. Henderson had received dividends on both common and preferred shares of the corporate defendant until she transferred her 11,000 shares of the common stock of said company to plaintiff during the year 1967. Corporate dividends paid to Mrs. Henderson in recent years and now to plaintiff and Mrs. Henderson have increased substantially in recent years. As of December 3, 1968, dividends paid to plaintiff and Mrs. Henderson in that year totalled $385,240. In 1966, Mrs. Henderson had received dividends in the amount of $292,840, and in 1967, a year in which Alexander Dawson, Inc., made a controversial charitable contribution having a value of $528,000, the combined dividends of plaintiff and Mrs. Henderson totalled $286,240.

In January of 1955, the defendant Girard B. Henderson and his then wife, Theodora G. Henderson, had entered into a separation agreement looking towards a divorce, at which time Mrs. Henderson's dividends from the corporate defendant totalled approximately $50,000 per annum. Under the terms of such agreement Mrs. Henderson acknowledged that she had received from her then husband the shares of common stock of Alexander Dawson,

Inc., here in issue as well as a number of shares of preferred stock of such corporation. Upon plaintiff's organization, it became the owner of Mrs. Henderson's 11,-000 shares of common stock[1] on May 3, 1967. As of April 30, 1967, the shares of Alexander Dawson, Inc., to be turned over to the plaintiff corporation had a fair market value of $15,675,000 and an underlying net asset value of $28,996,000. Mrs. Henderson has since placed certain Dawson shares in trust for her own benefit and that of her two daughters and their issue.

The individual defendant Henderson by reason of the extent of his combined majority holdings of common and preferred stock of Alexander Dawson, Inc., each class of which has voting rights, exercises effective control over the affairs of such corporation, the net worth of the assets of which, at the time of the filing of this suit, was approximately $150,000,000.

It is claimed and the evidence supports such contention that on December 8, 1967, the defendant Girard B. Henderson, by virtue of his voting control over the affairs of Alexander Dawson, Inc., caused the board of directors of such corporation to be reduced in number from eight to three persons, namely himself, the defendant Bengt Ljunggren,[2] an employee of the corporate defendant, and Mr. Henderson's daughter, Theodora H. Ives. It is alleged that thereafter the defendant Girard B. Henderson (over the objection of the director, Mrs. Ives) caused the board and the majority of the voting stock of Alexander

1. Because it did not become a holder of Alexander Dawson, Inc., stock until May of 1967, the individual defendants contend that plaintiff cannot complain of corporate transactions which occurred prior to that date, Title 8 Del.C. § 327, and Rule 23.1, Del.C.Ann. This procedural rule, however, was designed to militate against the wrong of buying into a derivative law suit and should not be allowed to bar an action by a stockholder with a long standing equitable interest in a corporation, Rosenthal v. Burry Biscuit Co., 30 Del.Ch. 296, 60 A.2d 106, and Maclary v. Pleasant Hills, Inc., 35 Del. Ch. 39, 109 A.2d 830. Had the harsh

rule of Myer v. Myer, 271 App.Div. 465, 66 N.Y.S.2d 83, been invoked, I would have entertained a motion for the joinder of Theodora G. Henderson as a party plaintiff in light of her continuing ownership of preferred stock of Alexander Dawson, Inc.

2. Mr. Ljunggren, whose forte appears to be that of public relations, joined Alexander Dawson, Inc., in 1966 at a salary of $12,000 per annum. He has since been rewarded with substantial raises and bonuses which have more than doubled his starting salary.

Dawson, Inc., improperly to contribute stock held by it in the approximate value of $550,000 to the Alexander Dawson Foundation, a charitable trust, the affairs of which were then controlled and continue to be controlled by Mr. Henderson. Another claim asserted by plaintiff is to the effect that in November or December of 1967, the defendant Henderson wrongfully transferred assets of Alexander Dawson, Inc., consisting of some $14,000,000 in cash, to accounts in Switzerland, where a portion of said moneys was converted or sought to be converted into silver bullion and Swiss francs at a cost to the corporate defendant of more than $2,500,000. It is also claimed that on November 10, 1958, the defendant improperly caused the board of the corporate defendant to acquire rights to a membership on the New York Stock Exchange for said Henderson's personal use, and that said membership having been thereafter sold on January 22, 1968, at a net profit of $330,000, such profit was thereupon appropriated by Mr. Henderson. Plaintiff argues that the transaction complained of occurred in 1968 when the Stock Exchange seat, allegedly the property of the corporation, was sold and the profit pocketed by Mr. Henderson. However, as noted earlier, I am of the opinion that a decision as to the precise time at which this transaction occurred is not required because Mrs. Henderson's direct interest in the defendant corporation as well as her indirect interest therein through the plaintiff corporation constitute compliance with the requirements of 8 Del.C. § 327, and Rule 23.1. It is further claimed that in March 1968 the defendant Henderson caused some $1,400,000 of the corporate defendant's assets to be invested in an airplane servicing and mechanics training project known as Kensair Corporation and that said entire investment has been irretrievably lost. It is next alleged that in December, 1967, an additional sum of approximately $737,000.00 of corporate funds was lost by reason of Mr. Henderson's application of the corporate defendant's funds to a research project known as Credo, Inc. It is finally claimed that other sums in lesser amounts have been dissipated on other unprofitable projects; that Mr. Henderson has improperly paid to himself non-interest bearing corporate loans, and that on the basis of the many instances of gross mismanagement of Alexander Dawson, Inc. charged in the complaint that a liquidating receiver should be appointed. However, after trial, plaintiff now limits its application for relief to recovery of the profit gained by Mr. Henderson as a result of the sale of a New York Stock Exchange seat together with the commissions earned through the use of such seat, to an accounting for the alleged improper corporate gift of $528,000 to the Alexander Dawson Foundation in 1967, and finally to the appointment of a liquidating receiver on the ground of gross mismanagement and distortion of corporate purpose on the part of Mr. Henderson.

Alexander Dawson, Inc. has functioned as a personal holding company since 1935 when Mr. Henderson's mother exchanged a substantial number of shares held by her in a company which later became Avon Products, Inc., for all of the shares of her own company known as Alexander Dawson, Inc. Mr. Henderson and a brother later succeeded to their mother's interest in Alexander Dawson, Inc., the brother thereafter permitting his shares to be redeemed by the corporation. As noted earlier, Mr. Henderson, by reason of his combined holdings of common and preferred stock of the corporate defendant, is in clear control of the affairs of such corporation, which, for the most part, has been operated informally by Mr. Henderson with scant regard for the views of other board members. Some seventy-five percent of its assets consist of shares of Avon Products, Inc. stock, there having been some diversification, particularly in 1967, largely through the urging of officers of the United States Trust Company of New York who have served as advisors. Through exercise of such control, Mr. Henderson has, since 1957,

caused the corporate defendant to donate varying amounts to a charitable trust organized in that year by Mr. Henderson, namely the Alexander Dawson Foundation. In 1957, $10,610 was donated to such trust. From 1960 to 1966 (except for the year 1965) gifts were in the range of approximately $63,000 to $70,000 or higher in each year other than 1963 when $27,923 was donated. In 1966, however, a gift in the form of a large tract of land in Colorado, having a value of some $467,750, was made.[3] All of these gifts through 1966 were unanimously approved by all of the stockholders of Alexander Dawson, Inc., including Mrs. Theodora G. Henderson. The gift now under attack, namely one of the shares of stock of the corporate defendant having a value of some $528,000, was made to the Alexander Dawson Foundation in December of 1967. Such gift was first proposed by Mr. Henderson in April, 1967 before the board of the corporate defendant was reduced in number from eight to three. However, director reaction was thereafter confused, one of the directors, Mrs. Henderson's daughter, Theodora H. Ives, having expressed a desire that a corporate gift also be made to her own charitable corporation and that of her mother, Theodora G. Henderson. Accordingly, the matter was not pressed by Mr. Henderson until late December when the reduced board had taken over management of the corporate defendant. It is claimed and admitted that such gift had an effect on the equity and dividends of shareholders of the corporate defendant although the tax consequences of such gift clearly soften the apparent impact of such transaction. It is significant, however, as noted above, that the 1966 corporate gift, consisting of a ranch located in Colorado, had been approved by all of the directors and stockholders of the corporate defendant, and that the gift here under attack was apparently intended to be a step towards consummation of the purpose behind such grant of land, namely to provide a fund for the financing of a western camp for under privileged boys, particularly members of the George Junior Republic, a self-governing institution which has served the public interest for some seventy-five years at a school near Freeville, New York. Thus, in the summer of 1967, a small group of under privileged children had enjoyed the advantages of such camp in a test of the feasibility of such an institution. However, it is apparently Mr. Henderson's intention to continue and expand his interest in such camp where he maintains an underground home which he occupies at a $6,000 rental per annum, such house being occupied by him during some three months of the year. Plaintiff initially attacked such use. However, as in the case of charges made concerning the purchase of silver bullion and Swiss francs, as well as corporate investments in Credo, Inc., Kensair Corporation and other enterprises plaintiff seeks no accounting from the individual defendants concerning any of several specific transactions complained of other than those which charge Mr. Henderson with breaches of fiduciary duty in the purchase and sale of a seat on the New York Stock Exchange and the charitable gift of shares of stock of the corporate defendant having a value of $528,000 to the Alexander Dawson Foundation, although, to be sure, plaintiff asks that all actions undertaken by Mr. Henderson which demonstrate a course of irresponsible corporate conduct as well as misuse of corporate power and assets should be considered by the Court in reaching an ultimate decision on the question of whether or not a liquidating receiver for Alexander Dawson, Inc., should be appointed.

█ Turning to the controversy over the defendant Henderson's purchase of a seat on the New York Stock Exchange in November, 1958, a transaction which involved use of $120,000 of the corporate de-

---

3. Mr. Henderson also made a personal donation of $122,602 to the Foundation in 1966.

fendant's funds, it is clear, first of all, that the seat in question was purchased in Mr. Henderson's name and that while corporate funds were used for the purchase Mr. Henderson entered the sums used in his cheque book as loaned or advanced. Plaintiff claims, however, that the seat in question was in fact purchased on behalf of Alexander Dawson, Inc., that Mr. Henderson was a mere nominee for the corporation, and that purported November 10, 1958 corporate minutes to such effect signed by Mr. Turnbull (Mr. Henderson's attorney) as secretary of the meeting, reflect what actually was contemplated, although the directors purportedly present at such meeting did not sign an attached waiver of notice.[5] And while Mr. Henderson concedes that the original plan was to have the seat to be purchased held by him merely as nominee of the corporation, he testified that he had learned from his broker prior to his appearance before a subcommittee on admissions of the New York Stock Exchange on November 12, 1958, that the Board of Governors of the Exchange is not authorized to approve a corporation as an Exchange member unless, inter alia, the primary purpose of such corporation in becoming a member is the transaction of business as a broker or dealer in securities, Constitution and Rules, New York Stock Exchange, Article IX, § 1407. Accordingly, Mr. Henderson contends that he thereupon concluded that he must buy the seat with his own means and so testified before the sub-committee. However, he overlooks the fact that on November 7 when he drew a personal cheque to the order of the treasurer of the Exchange in the amount of $23,400 in part payment for the seat in question, he had simultaneously drawn a corporate cheque to his order in the amount of $25,000 contrary to the terms of 8 Del.C. § 143 which then forbade loans to corporate officers. On November 10, he borrowed $85,000 more from the corporate defendant, and passed on said money to the Stock Exchange, using his personal account and not that of the corporate defendant. Significantly, however, such Stock Exchange seat was carried on the balance sheets of Alexander Dawson, Inc. as an asset or the like and not as a loan receivable from as early as July 31, 1961 until Mr. Henderson had repaid the money he had borrowed from the corporate defendant for application to the controversial purchase.

I conclude that in a situation in which the defendant Henderson was faced with the dilemma of violating a basic rule[6] of the New York Stock Exchange or a section of the Delaware Corporation Law, he chose to violate the statute by using improperly borrowed corporate funds for his own ultimate benefit (though, to be sure, he did not remit brokerage commissions to the corporation until the so-called loan had been paid off), and the question as to whether or not the November 10, 1958 board meeting actually took place thus becomes insignificant.

In short, I am of the opinion that in a situation in which Mr. Henderson as president and the majority stockholder of the corporate defendant had a duty not to place his own interest above that of the corporation and to refrain from enriching himself through the use of allegedly borrowed corporate funds, such defendant is not entitled to the protection of the business judgment rule. Gottlieb v. McKee, 34 Del.Ch. 537, 107 A.2d 240. Compare Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.

---

5. Mr. Henderson when asked whether or not such meeting was ever held, answered: "Not to the best of my knowledge sir." The other two directors allegedly present, namely Mrs. Theodora G. Henderson and Dariel A. Henderson, did not testify at trial or by deposition.

6. Mr. Henderson did not demonstrate candor before the subcommittee in that he not only failed to disclose that he had purportedly borrowed $120,000 from the corporate defendant for the purchase in question but also neglected to report the terms of such loan. See Constitution and Rules, New York Stock Exchange, § 2301.30 et seq.

2d 503. Accordingly, such defendant must account to the corporate defendant for any profits made by him in the sale of the Stock Exchange seat here in issue as well as for the receipt of any brokerage commissions not already remitted by him to the corporation.

■ The next matter to be considered is the propriety of the December 1967 gift made by Alexander Dawson, Inc. to the Alexander Dawson Foundation of shares of stock of the corporate defendant having a value in excess of $525,000, an amount within the limits of the provisions of the federal tax law having to do with deductible corporate gifts, Internal Revenue Code of 1954 §§ 170(b) (2), 545(b) (2).

Title 8 Del.C. § 122 provides as follows:

"Every corporation created under this chapter shall have power to—

\* \* \* \* \* \*

(9) Make donations for the public welfare or for charitable, scientific or educational purposes, and in time of war or other national emergency in aid thereof."

There is no doubt but that the Alexander Dawson Foundation is recognized as a legitimate charitable trust by the Department of Internal Revenue. It is also clear that it is authorized to operate exclusively in the fields of " \* \* \* religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals \* \* \*". Furthermore, contemporary courts recognize that unless corporations carry an increasing share of the burden of supporting charitable and educational causes that the business advantages now reposed in corporations by law may well prove to be unacceptable to the representatives of an aroused public. The recognized obligation of corporations towards philanthropic, educational and artistic causes is reflected in the statutory law of all of the states, other than the states of Arizona and Idaho.

In A. P. Smith Mfg. Co. v. Barlow, 13 N.J. 145, 98 A.2d 681, 39 A.L.R.2d 1179, appeal dismissed, 346 U.S. 861, 74 S.Ct. 107, 98 L.Ed. 373, a case in which the corporate donor had been organized long before the adoption of a statute authorizing corporate gifts to charitable or educational institutions, the Supreme Court of New Jersey upheld a gift of $1500 by the plaintiff corporation to Princeton University, being of the opinion that the trend towards the transfer of wealth from private industrial entrepreneurs to corporate institutions, the increase of taxes on individual income, coupled with steadily increasing philanthropic needs, necessitate corporate giving for educational needs even· were there no statute permitting such gifts, and this was held to be the case apart from the question of the reserved power of the state to amend corporate charters. The court also noted that the gift tended to bolster the free enterprise system and the general social climate in which plaintiff was nurtured. And while the court pointed out that there was no showing that the gift in question was made indiscriminately or to a pet charity in furtherance of personal rather than corporate ends, the actual holding of the opinion appears to be that a corporate charitable or educational gift to be valid must merely be within reasonable limits both as to amount and purpose. Compare Union Pacific R. R. v. Trustees, Inc., 8 Utah 2d 101, 329 P.2d 398.

The New Jersey statute in force and effect at the time of the Smith case gift provided that directors might cause their corporation ·to contribute for charitable and educational purposes and the like " \* \* such reasonable sum or sums as they may determine \* \* \*" provided, however, that such contributions might not be made in situations where the proposed donee owned more than 10% of the voting stock of the donor and provided further that such gifts be limited to 5% of capital and surplus unless " \* \* \* authorized by the stockholders."

■ Whether or not these statutory limitations on corporate giving were the source of the limiting language of the New Jersey Supreme Court is not clear, the point being that the Delaware statute contains no such limiting language and therefor must, in my opinion, be construed to authorize any reasonable corporate gift of a charitable or educational nature. Significantly, Alexander Dawson, Inc. was incorporated in Delaware in 1958 after 8 Del.C. § 122(9) was cast in its present form, therefor no constitutional problem arising out of the effect on a stockholder's property rights of the State's reserved power to amend corporate charters is presented.

I conclude that the test to be applied in passing on the validity of a gift such as the one here in issue is that of reasonableness, a test in which the provisions of the Internal Revenue Code pertaining to charitable gifts by corporations furnish a helpful guide. The gift here under attack was made from gross income and had a value as of the time of giving of $528,000 in a year in which Alexander Dawson, Inc.'s total income was $19,144,229.-06, or well within the federal tax deduction limitation of 5% of such income. The contribution under attack can be said to have "cost" all of the stockholders of Alexander Dawson, Inc. including plaintiff, less than $80,000, or some fifteen cents per dollar of contribution, taking into consideration the federal tax provisions applicable to holding companies as well as the provisions for compulsory distribution of dividends received by such a corporation. In addition, the gift, by reducing Alexander Dawson, Inc.'s reserve for unrealized capital gains taxes by some $130,000, increased the balance sheet net worth of stockholders of the corporate defendant by such amount. It is accordingly obvious, in my opinion, that the relatively small loss of immediate income otherwise payable to plaintiff and the corporate defendant's other stockholders, had it not been for the gift in question, is far out-weighed by the overall benefits flowing from the placing of such gift in channels where it serves to benefit those in need of philanthropic or educational support, thus providing justification for large private holdings, thereby benefiting plaintiff in the long run. Finally, the fact that the interests of the Alexander Dawson Foundation appear to be increasingly directed towards the rehabilitation and education of deprived but deserving young people is peculiarly appropriate in an age when a large segment of youth is alienated even from parents who are not entirely satisfied with our present social and economic system.

■ Plaintiff seeking to draw an analogy between the bizarre situation found to exist in the case of Tansey v. Oil Producing Royalties, Inc., 36 Del.Ch. 472, 133 A.2d 141, decided in 1957, to the facts at bar, prays finally that a liquidating receiver be appointed for the corporate defendant. In the cited case it appeared that the basic purpose of the company for which a receiver was sought was to purchase and hold oil royalties. The evidence before the Court was to the effect that while the corporation was in fact the holder of some $20,000 of oil royalties, it had, with one minor exception, purchased no royalty interests since 1930. In addition, the chief executive officer and majority stockholder of the defendant corporation testified that he had no intention of continuing the business of the company. Such individual defendant having been found by the Chancellor to be advanced in years and with "strange" ideas, the Court concluded that such officer's high handed practice of using the corporation as a vehicle for loans without regard to the views of other corporate officers and directors actually threatened the rights of the corporation's preferred stockholders. Accordingly, a liquidating receiver was appointed. In the case at bar, on the other hand the value of the assets of the corporate defendant has steadily increased largely through appreciation in value of its stock in Avon Products, Inc. between the

time Mr. Henderson became president and chairman of the board of Alexander Dawson, Inc. in the mid 1940's and December 31, 1967. As of the earlier date such stock had a value of $1,900,000, while the corporation's financial statements as of the latter date list the value [7] of such stock based on market quotations to be $115,593,772.50. And while Mr. Henderson has accepted recommendations for some diversification of investment for the corporate defendant, particularly in 1967, it has been his confidence in Avon and its retention in the corporate defendant's portfolio which has led to the enormous growth in the value of Alexander Dawson, Inc.'s assets in the last twenty years. Compare Hall v. John S. Isaacs & Sons Farms, Inc., 39 Del. Ch. 244, 163 A.2d 288. As stated in Warshaw v. Calhoun (Del.Sup.Ct.), 221 A.2d 487:

"It is plain, we think, that for a court to order a dissolution or liquidation of a solvent corporation, the proponents must show a failure of corporate purpose, a fraudulent disregard of the minority's rights, or some other fact which indicates an imminent danger of great loss resulting from fraudulent or absolute mismanagement. Berwald v. Mission Development Co., 40 Del.Ch. 509, 185

A.2d 480, and Graham-Newman Corp. v. Franklin County Distilling Co., 26 Del. Ch. 233, 27 A.2d 142. As we pointed out in Hall v. John S. Isaacs & Sons Farms, Inc., 39 Del.Ch. 244, 163 A.2d 288, the remedy of a minority stockholder in a corporation who is dissatisfied with its management or method of operation is to withdraw from the corporate enterprise by the sale of his stock when the minority stockholder's complaint is not based on any illegality."

Finally, none of the separate transactions sought to be relied on by plaintiff to demonstrate gross mismanagement or a threat to the corporate defendant's existence as a viable business entity, considered separately or cumulatively, not only fail to demonstrate the type of corporate perversion or self-dealing which warrant interference by a court of equity but rather have been shown to be reasonable corporate acts within the business judgment rule. Plaintiff's application for the appointment of a liquidating receiver for Alexander Dawson, Inc. must be denied.

On notice, an order in conformity with the holdings of this opinion may be presented.

7. The cost of said shares, presumably as of 1935, is given as $43,970.31.