**Alan R. KAHN, Barnett Stepak, California Public Employees' Retirement System, Objectors Below, Appellants,**

v.

**Joseph SULLIVAN and Alan Brody, Plaintiffs Below,**

**Michael Hammer, Special Administrator of the Estate of Dr. Armand Hammer, Occidental Petroleum Corporation, Dr. Ray Irani, Arthur B. Krim, Morrie A. Moss, Aziz D. Syriani, O.C. Davis, Senator Albert Gore, Arthur Groman, Michael A. Hammer, David A. Hentschel, J. Roger Hirl, John Kluge, Louis Nizer, George O. Nolley, Dr. C. Erwin Piper, Gerald M. Stern, Rosemary Tomich, Defendants Below,**

**The Armand Hammer Museum of Art and Cultural Center, Inc., Intervenor Below, Appellee.**

Supreme Court of Delaware.

Submitted: July 9, 1991.[1]
Decided: July 9, 1991.

---

**1.** One of the parties, Dr. Armand Hammer, died on December 10, 1990 during the course of

briefing this appeal. When this Court heard oral argument on January 23, 1991, the litigants were advised of the need to substitute Dr. Hammer's estate as a party. Supr.Ct.R. 31(c). The announcement of a disposition in this appeal has been delayed until the estate of Dr. Armand Hammer was substituted as a party. The substitution occurred on July 9, 1991, following protracted proceedings in California.

Robert D. Goldberg, Biggs and Battaglia, Wilmington, Sidney Silverman (argued), Silverman, Harnes & Obstefeld, New York City, John K. Van de Kamp, Atty. Gen., for the State of Cal., and Susan Henrichson (argued), Deputy Atty. Gen., for the State of Cal., for objectors-appellants Alan R. Kahn and California Public Employees' Retirement System respectively.

Thomas G. Hughes, Schlusser, Reiver, Hughes & Sisk, Wilmington, for objector-appellant Barnett Stepak.

William Prickett (argued), and Michael Hanrahan, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Arthur T. Susman and Terry R. Saunders, Susman, Saunders and Buchler, Chicago, Ill., and David Bershad and Steven G. Schulman, Milberg, Weiss, Bershad, Specthris and Lerach, New York City, for plaintiffs Joseph Sullivan and Alan Brody.

Grover C. Brown (argued), and Norris P. Wright, Morris, James, Hitchens & Williams, Wilmington, for defendants Senator Gore, Mr. Kluge, Mr. Krim, Mr. Nizer, Mr. Nolley, Dr. Piper, Mr. Syriani and Ms. Tomich.

Bruce M. Stargatt, Edward B. Maxwell, 2nd, Young, Conaway, Stargatt & Taylor, Wilmington, Bruce W. Kauffman, Stephen J. Mathes and Camille J. Wolfe, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for individual defendants Dr. Irani, Mr. Moss, Mr. Davis, Mr. Groman, Mr. Hammer, Mr. Hentschel, Mr. Hirl, Mr. Stern and Michael Hammer, Sp. Adm'r of the Estate of Dr. Armand Hammer.

Charles Crompton and Donald J. Wolfe, Jr., Potter, Anderson & Corroon, Wilmington, for defendant Occidental Petroleum Corp.

Rodman Ward, Jr. and Marc B. Tucker, Skadden, Arps, Slate, Meagher & Flom, Wilmington, for intervenor-appellee Armand Hammer Museum of Art and Cultural Center, Inc.

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ.

HOLLAND, Justice:

This is an appeal from the approval of the settlement of one of three civil actions brought in the Court of Chancery by certain shareholders of Occidental Petroleum Corporation ("Occidental"). Each civil action challenged a decision by Occidental's board of directors (the "Board"), through a special committee of Occidental's outside directors ("the Special Committee"), to make a charitable donation. The purpose of the charitable donation was to construct and fund an art museum.

The shareholder plaintiffs in this litigation,[2] Joseph Sullivan and Alan Brody, agreed to a settlement of their class and derivative actions subject to the approval of the Court of Chancery. The settlement was authorized, on behalf of Occidental, by the Special Committee. The shareholder plaintiffs in the other two civil actions,[3] Alan R. Kahn ("Kahn") and Barnett Stepak ("Stepak"), appeared in the *Sullivan* action and objected to the proposed settlement. California Public Employees Retirement System ("CalPERS") was permitted to intervene as a shareholder plaintiff in the *Kahn* action and also appeared in opposition to the proposed settlement in the *Sullivan* action.

**2.** *Sullivan, et al. v. Hammer, et al.,* C.A. No. 10823 ("the *Sullivan* action").

**3.** *Kahn v. Occidental Petroleum Corporation, et al.,* C.A. No. 10808 ("the *Kahn* action"); *Stepak v. Hammer, et al.,* C.A. No. 10860 ("the *Stepak* action").

On April 4, 1990, a settlement hearing was held in the *Sullivan* action by the Court of Chancery. In a memorandum opinion dated August 7, 1990, the Court of Chancery concluded that, under all of the circumstances, the terms of the settlement in the *Sullivan* action were fair and reasonable. It ordered that the settlement be approved. Kahn, CalPERS and Stepak ("the Objectors") have each appealed from that decision and order by the Court of Chancery.

The Objectors contend that the Court of Chancery abused its discretion in approving the settlement in the *Sullivan* action. The Objectors' first contention is that the Court of Chancery erred in holding that it was "highly probable" that the protection of the business judgment rule would successfully apply to the actions taken by the directors of Occidental who had been named as defendants. The Objectors' second contention is that the Court of Chancery abused its discretion in finding that the shareholder plaintiffs' claims of corporate waste were weak. Finally, the Objectors contend that the Court of Chancery abused its discretion in approving the settlement because the consideration for the settlement was inadequate in view of the strength of the claims which were being compromised.

The applicable standard of appellate review requires this Court to examine the record for an abuse of discretion by the Court of Chancery in approving the settlement. We have carefully reviewed the record and considered the Objectors' contentions. We have concluded that the decision of the Court of Chancery must be affirmed.

*Facts*

Occidental is a Delaware corporation. According to the parties, Occidental has about 290 million shares of stock outstanding which are held by approximately 495 thousand shareholders. For the year ending December 31, 1988, Occidental had assets of approximately twenty billion dollars, operating revenues of twenty billion dollars and pre-tax earnings of $574 million. Its corporate headquarters are located in Los Angeles, California.

At the time of his death on December 10, 1990, Dr. Hammer was Occidental's chief executive officer and the chairman of its board of directors. Since the early 1920's, Dr. Hammer had been a serious art collector. When Dr. Hammer died, he personally and The Armand Hammer Foundation (the "Foundation"), owned three major collections of art (referred to in their entirety as "the Art Collection"). The Art Collection, valued at $300–$400 million included: "Five Centuries of Art," more than 100 works by artists such as Rembrandt, Rubens, Renoir and Van Gogh; the *Codex Hammer*, a rare manuscript by Leonardo da Vinci; and the world's most extensive private collection of paintings, lithographs and bronzes by the French satirist Honore Daumier. *See The Armand Hammer Collection* (J. Walker 2d ed. 1982).

For many years, the Board has determined that it is in the best interest of Occidental to support and promote the acquisition and exhibition of the Art Collection. Through Occidental's financial support and sponsorship, the Art Collection has been viewed by more than six million people in more than twenty-five American cities and at least eighteen foreign countries. The majority of those exhibitions have been in areas where Occidental has operations or was negotiating business contracts. Occidental's Annual Reports to its shareholders have described the benefits and good will which it attributes to the financial support that Occidental has provided for the Art Collection.

Dr. Hammer enjoyed an ongoing relationship with the Los Angeles County Museum of Art ("LACMA") for several decades. In 1968, Dr. Hammer agreed to donate a number of paintings to LACMA, as well as funds to purchase additional art. For approximately twenty years thereafter, Dr. Hammer both publicly and privately expressed his intention to donate the Art Collection to LACMA. However, Dr. Hammer and LACMA had never entered into a

binding agreement to that effect. Nevertheless, LACMA named one of its buildings the Frances and Armand Hammer Wing in recognition of Dr. Hammer's gifts.[4]

Occidental approved of Dr. Hammer's decision to permanently display the Art Collection at LACMA. In fact, it made substantial financial contributions to facilitate that display. In 1982, for example, Occidental paid two million dollars to expand and refurbish the Hammer Wing at LACMA.

In 1987, Dr. Hammer presented Daniel N. Belin, Esquire ("Belin"), the president of LACMA's Board of Trustees, with a thirty-nine page proposed agreement which set forth the terms upon which Dr. Hammer would permanently locate the Art Collection at LACMA. LACMA and Dr. Hammer tried, but were unable to reach a binding agreement. Consequently, Dr. Hammer concluded that he would make arrangements for the permanent display of the Art Collection at a location other than at LACMA. On January 8, 1988, Dr. Hammer wrote a letter to Belin which stated that he had "decided to create my own museum to house" the Art Collection.

On January 19, 1988, at a meeting of the executive committee of Occidental's board of directors ("the Executive Committee"), Dr. Hammer proposed that Occidental, in conjunction with the Foundation, construct a museum for the Art Collection. After discussing Occidental's history of identification with the Art Collection, the Executive Committee decided that it was in Occidental's best interest to accept Dr. Hammer's proposal. The Executive Committee approved the negotiation of arrangements for the preliminary design and construction of an art museum.[5] It would be located adjacent to Occidental's headquarters, on the site of an existing parking garage used by Occidental for its employees. The Executive Committee also decided that once the

art museum project was substantially defined, a final proposal would be presented to the Board or the Executive Committee for approval and authorization.

The art museum concept was announced publicly on January 21, 1988. On February 11, 1988, the Board approved the Executive Committee's prior actions. Occidental informed its shareholders of the preliminary plan to construct The Armand Hammer Museum and Cultural Center of Art ("the Museum") in its 1987 Annual Report. In accordance with the January 19, 1988 resolutions passed by the Executive Committee, construction of a new parking garage for Occidental began in the fall of 1988. The Board approved a construction bond on November 10, 1988.

On December 15, 1988, the Board was presented with a detailed plan for the Museum proposal. The Board approved the concept and authorized a complete study of the proposal. Following the December 15th Board meeting, the law firm of Dilworth, Paxson, Kalish & Kauffman ("Dilworth") was retained by the Board to examine the Museum proposal and to prepare a memorandum addressing the issues relevant to the Board's consideration of the proposal.[6] The law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps") was retained to represent the new legal entity which would be necessitated by the Museum proposal. Occidental's public accountants, Arthur Andersen & Co. ("Arthur Andersen"), were also asked to examine the Museum proposal.

On or about February 6, 1989, ten days prior to the Board's prescheduled February 16 meeting, Dilworth provided each member of the Board with a ninety-six page memorandum. It contained a definition of the Museum proposal and the anticipated magnitude of the proposed charitable donation by Occidental. It reviewed the authority of the Board to approve such a donation

---

**4.** *See* J. Bryson, *The World of Armand Hammer* 194–97 (1985) (numerous color photographs of the Frances and Armand Hammer Wing of LACMA are displayed).

**5.** Both Dr. Hammer and another member of the Executive Committee, Arthur Groman, who was

also on the Foundation's Board of Directors, abstained from voting.

**6.** At the time of its selection, Dilworth also represented Dr. Hammer personally.

and the reasonableness of the proposed donation. The Dilworth memorandum included an analysis of the donation's effect on Occidental's financial condition, the potential for good will and other benefits to Occidental, and a comparison of the proposed charitable contribution by Occidental to the charitable contributions of other corporations.

The advance distribution of the Dilworth memorandum was supplemented on February 10, 1989 by a tax opinion letter from Skadden Arps. That same day, the Board also received a consulting report from the Duncan Appraisal Corporation. The latter document addressed the option price for the Museum's purchase of Occidental's headquarters building, museum facility and parking garage in thirty years as contemplated by the Museum proposal.

During the February 16 Board meeting, a Dilworth representative personally presented the basis for that law firm's analysis of the Museum proposal, as set forth in its February 6 written memorandum. The presentation reviewed again the directors' standard of conduct in considering the Museum proposal, as well as the financial and tax consequences to Occidental as a result of the donation. Following the Dilworth presentation, the Board resolved to appoint the Special Committee, comprised of its eight independent and disinterested outside directors, to further review and to act upon the Museum proposal:

RESOLVED, that a special committee be, and hereby is appointed for the purpose of considering and acting on the Proposal (the "Special Committee"). A copy of the Proposal is attached hereto as Exhibit "A";

FURTHER RESOLVED, that the Special Committee shall consist of the following directors of the Corporation: Senator Gore, Mr. Kluge, Mr. Krim, Mr. Nizer, Mr. Nolley, Dr. Piper, Mr. Syriani and Miss Tomich.

FURTHER RESOLVED, that the Special Committee shall have and is hereby granted full authority to consider, act on, approve and authorize the Proposal and the Special Committee's action respecting the Proposal shall be deemed the action of the Board of Directors of the Corporation and shall bind the Corporation to the same extent as an action of the full Board of Directors.

The Board then adjourned to allow the Special Committee to meet.

The Special Committee consisted of individuals who collectively had approximately eighty years of service on Occidental's board of directors. In alphabetical order, they are as follows: Albert Gore [7]; John W. Kluge [8]; Arthur B. Krim [9]; Louis Nizer [10]; George O. Nolley [11]; Dr. C. Erwin Piper [12]; Aziz D. Syriani [13]; and Rosemary Tomich [14]. Those Board members were not

---

**7.** Albert Gore was an attorney, a United States Congressman from Tennessee from 1939 to 1953 and a United States Senator from Tennessee from 1953 to 1971. He had been a director of Occidental for eighteen years.

**8.** John W. Kluge was the President and Chairman of the Board of Metromedia Corporation, a major independent broadcasting and outdoor advertising company. He had been a director of Occidental for six years.

**9.** Arthur B. Krim was Chairman of the Board of Orion Pictures Corporation. He had been a director of Occidental for fourteen years.

**10.** Louis Nizer was a senior partner of the law firm of Phillips, Nizer, Benjamin, Krim & Ballon and a well-known author. He had been a director of Occidental for eight years.

**11.** George O. Nolley was the founder, an officer and director of the Permian Corporation, which subsequently became a wholly-owned subsidiary of Occidental. He had been a director of Occidental for seven years.

**12.** C. Erwin Piper was a special agent for the Federal Bureau of Investigation, from 1941 to 1961, serving as Agent in Charge of the Honolulu, Memphis, Indianapolis and San Diego offices. He had been a director of Occidental for ten years.

**13.** Aziz D. Syriani was the President and Chief Operating Officer of The Olayan Group of Companies, a diversified trading, services and investment organization with interests in the Middle East and elsewhere. He had been a director of Occidental for seven years.

**14.** Rosemary Tomich was the owner of Hope Cattle Company, A.S. Tomich Construction Company, and Chairman and Chief Executive Officer of Livestock Clearing, Inc. She had been a director of Occidental for ten years.

officers of Occidental, and were not associated with the Museum or the Foundation.

On February 16, 1989, following the adjournment of the Board meeting, the Special Committee met to consider the proposal presented to the full Board for establishing the Museum. The Special Committee requested the representatives of Dilworth to attend the meeting to respond to any questions relating to its February 6, 1989 opinion letter and memorandum. The Special Committee also asked representatives from Skadden Arps and Arthur Andersen to attend its meeting to address questions concerning the proposed charitable contribution.[15]

The minutes of the February 16, 1989 meeting of the Special Committee outline its consideration of the Museum proposal. Those minutes reflect that many questions were asked by members of the Special Committee and were answered by the representatives of Dilworth, Skadden Arps, or Arthur Andersen. As a result of its own extensive discussions, and in reliance upon the experts' opinions, the Special Committee concluded that the establishment of the Museum, adjacent to Occidental's corporate offices in Los Angeles, would provide benefits to Occidental for at least the thirty-year term of the lease. The Special Committee also concluded that the proposed museum would establish a new cultural landmark for the City of Los Angeles.

On February 16, 1989, the Special Committee unanimously approved the Museum proposal, subject to certain conditions. The proposal approved by the Special Committee included the following provisions:

(1) Occidental would construct a new museum building, renovate portions of four floors of its adjacent headquarters for use by the Museum, and construct a parking garage beneath the museum for its own use for a total cost of approximately $50 million.

(2) Occidental would lease the Museum building and the four floors of its headquarters to the Museum rent-free for a term of thirty years. Occidental would continue to pay the property taxes, and the Museum would pay the utilities and maintenance expenses;

(3) Occidental would purchase a thirty-year annuity at an estimated cost of $35.6 million to provide for the funding of the Museum's operations during its initial years;

(4) Occidental would grant the Museum an irrevocable option to purchase the Museum building, the parking garage, and the Occidental headquarters building in thirty years for $55 million;

(5) Dr. Hammer and the Foundation would transfer the Art Collection entirely to the Museum;

(6) The Museum would be named for Dr. Hammer—The Armand Hammer Museum of Art and Cultural Center.

(7) Occidental would have representation on the board of directors of the Museum;

(8) Occidental would receive public recognition for its role in establishing the Museum, for example, by the naming of the courtyard, library, or auditorium for Occidental and Occidental would have the right to use the Museum, and be entitled to "corporate sponsor" rights.

The Special Committee's unanimous approval of the proposal was subject to the following conditions:

(1) The incorporation of the Museum as a non-profit corporation under Delaware law;

(2) The determination by the Internal Revenue Service that the Museum would be a tax-exempt entity under the Internal Revenue Code;

(3) The receipt of supplementation of the February opinion letters to reflect tax issues discussed at the meeting, including the question of self-dealing; and

(4) The execution of the necessary documents relating to (a) the lease of the Museum facilities, (b) the Museum's option to purchase Occidental's headquarters, (c) Occidental's lease-back rights if the option was exercised, and (d)

---

15. The minutes of the February 16, 1989 meeting of the Special Committee reflect that "[n]o one else was present at any time during our meeting which was held in the boardroom on the 16th Floor of the Occidental Petroleum Center Building."

an agreement for the transfer of the Collection from the Foundation and Dr. Hammer to the Museum, including a full inventory of the art.

The Special Committee decided to present requests for expenditures to carry out the foregoing resolutions to the Board in the form of Authorization for Expenditures ("AFE's"). The AFE's proposed by the Special Committee were unanimously approved by the Board when it reconvened on February 16, 1989.

On April 25, 1989, Occidental reported the Special Committee's approval of the Museum proposal to its shareholders in the proxy statement for its annual meeting to be held May 26, 1989. On May 2, 1989, the first shareholder action ("the *Kahn* action") was filed, challenging Occidental's decision to establish and fund the Museum proposal. The *Sullivan* action was filed on May 9, 1989.[16] On May 12, 1989, Occidental issued a supplement to the proxy statement.[17] The *Stepak* action was commenced on May 31, 1989.[18]

Settlement negotiations were entered into almost immediately between Occidental and the attorneys for the plaintiffs in the *Sullivan* action. The attorney for the plaintiffs in the *Kahn* action was invited to attend the settlement negotiations. After the parties to the *Sullivan* action were in substantial agreement, the attorney for the plaintiffs in the *Kahn* action said it was up to his clients whether to accept the settlement, but that he was not going to recommend it.

On June 3, 1989, the parties to the *Sullivan* action signed a Memorandum of Understanding that set forth a proposed settlement in general terms. The proposed settlement was subject to the right of the plaintiffs to engage in additional discovery to confirm the fairness and adequacy of the proposed settlement.

On June 9, 1989, the plaintiffs in the *Kahn* action moved for a preliminary injunction to enjoin the proposed settlement in the *Sullivan* action and also for expedited discovery. An order granting limited expedited discovery on the motion was entered over the defendants' objection. The motion for a preliminary injunction was denied by the Court of Chancery on July 19, 1989.

In denying the motion for injunctive relief, the Court of Chancery found that Kahn would suffer no irreparable harm if a proposed settlement in *Sullivan* was subsequently finalized and submitted for approval since Kahn, as a stockholder of Occidental, would have the opportunity to appear and object to the settlement. The Court of Chancery also identified six issues to be addressed at any future settlement hearing:

(1) the failure of the Special Committee appointed by the directors of Occidental to hire its own counsel and advisors or even to formally approve the challenged acts; (2) the now worthlessness of a prior donation by Occidental to the Los Angeles County Museum; (3) the huge attorney fees which the parties have apparently decided to seek or not oppose; (4) the egocentric nature of some of Armand Hammer's objections to the Los Angeles County Museum being the recipient of his donation; (5) the issue of who really owns the art; and (6) the lack of any direct substantial benefit to the stockholders.

On July 20, 1989, the Special Committee met to discuss the Museum proposal. At that time, the Special Committee was in

---

**16.** On May 11, 1989, Martin and Evelyn Levitan, along with the plaintiffs in the *Sullivan* action, filed a suit in the Superior Court of the State of California captioned *Levitan, et al. v. Occidental Petroleum Corporation, et. al.,* C.A. No. 001175 (the *"Levitan"* action), alleging claims substantially similar to those in the *Sullivan* action.

**17.** The supplement to the proxy statement included an identification of the directors serving on the Special Committee, and additional information about the total cost of the annuity, and

details regarding Occidental's existing option to purchase the Los Angeles headquarters property. The Objectors acknowledge that the supplement provided the disclosures sought in the *Sullivan* and *Levitan* complaints.

**18.** Each of the shareholder actions were filed without first making a demand on the Board. Occidental filed a motion to dismiss in all three civil actions.

receipt of a number of documents required as a result of the conditions precedent it had imposed on February 16, 1989 before it would finally approve the Museum proposal. Those documents included: the Certificate of Incorporation of The Armand Hammer Museum of Art and Cultural Center, Inc.; Internal Revenue Service correspondence;[19] opinion letters in draft form from Skadden Arps and Dilworth (later supplemented); a draft lease and option agreement; the Memorandum of Understanding in the *Sullivan* action; a list of the art works being transferred; and a proposed agreement for the transfer of the Collection to the Museum ("Transfer Agreement"). After reviewing the aforementioned documents and revising the Transfer Agreement, the Special Committee unanimously resolved that the conditions for approval, which it had imposed at their February 16, 1989 meeting, had been satisfied. The Special Committee then authorized Occidental to enter into the lease agreement[20] with the Museum and "to purchase a thirty-nine million dollar annuity, or other financial arrangement, for the benefit of the Museum, as contemplated by the proposal."

At its July 20 meeting, the Special Committee also reviewed the July 19, 1989 decision and order of the Court of Chancery denying Kahn's request for injunctive relief in the *Sullivan* action. In response to one of the concerns expressed by the Court of Chancery, the Special Committee resolved to retain independent Delaware counsel with no prior connection to Occidental or its officers. Thereafter, this independent counsel would advise the Special Committee with respect to the Museum proposal and the terms of any settlement of the shareholder litigation. The July 20 meeting of the Special Committee then adjourned.

On July 25, 1989, the Special Committee held a telephone conference to initially consider numerous law firms to serve as its independent counsel. The Special Committee reconvened by telephone on August 4, 1989. At that time it retained the law firm of Morris, James, Hitchens & Williams ("Morris James") as its independent Delaware legal counsel. The Special Committee met with Grover C. Brown, Esquire ("Brown") of Morris James on August 14, 1989 to discuss the shareholder actions that had been filed and the terms of the proposed settlement agreement in the *Sullivan* action. It met with Brown again on September 20, 1989, at which time it requested a revised Transfer Agreement, explained the basis for its prior actions, and resolved to continue proceeding as planned.

On October 6, 1989, Occidental's Board of Directors, by unanimous written consent, delegated full authority to the Special Committee to settle the shareholder litigation filed in Delaware on Occidental's behalf. Following this delegation of authority, Morris James submitted a written report to the Special Committee on the advisability of settlement. Additional questions from the Special Committee regarding the settlement were directed to Brown after a telephone meeting of the Special Committee on October 19, 1989.

The Special Committee met again on November 16, 1989. Prior to that meeting, the Special Committee received a draft of the Stipulation of Settlement of the *Sullivan* action, a revised Transfer Agreement in accordance with its September 20 request, and an abstract and analysis of the Transfer Agreement prepared by Morris James. At the meeting on November 16, all of these documents were discussed with Brown of Morris James. The form of a stipulation of settlement was approved unanimously by the Special Committee.

The parties to the *Sullivan* action presented the Court of Chancery with a fully executed Stipulation of Compromise, Settlement and Release agreement ("the Settlement") on January 24, 1990. This agreement was only slightly changed from the June 3, 1989 Memorandum of Under-

---

**19.** On June 26, 1989, the Internal Revenue Service granted the Museum's request for public charity status.

**20.** The following day, July 21, 1989, a lease agreement was executed for the Museum building and the four renovated floors of Occidental's headquarters.

standing. The Settlement, *inter alia*, provided:

(1) The Museum building shall be named the "Occidental Petroleum Cultural Center Building" with the name displayed appropriately on the building.

(2) Occidental shall be treated as a corporate sponsor by the Museum for as long as the Museum occupies the building.

(3) Occidental's contribution of the building shall be recognized by the Museum in public references to the facility.

(4) Three of Occidental's directors shall serve on the Museum's Board (or no less than one-third of the total Museum Board) with Occidental having the option to designate a fourth director.

(5) There shall be an immediate loan of substantially all of the art collections of Dr. Hammer to the Museum and there shall be an actual transfer of ownership of the collections upon Dr. Hammer's death or the commencement of operation of the Museum—whichever later occurs.

(6) All future charitable contributions by Occidental to any Hammer-affiliated charities shall be limited by the size of the dividends paid to Occidental's common stockholders. At current dividend levels, Occidental's annual contributions to Hammer-affiliated charities pursuant to this limitation could not exceed approximately three cents per share.

(7) Any amounts Occidental pays for construction of the Museum in excess of $50 million and any amounts paid to the Foundation upon Dr. Hammer's death must be charged against the agreed ceiling on limitations to Hammer-affiliated charities.

(8) Occidental's expenditures for the Museum construction shall not exceed $50 million, except that an additional $10 million may be expended through December 31, 1990 but only if such additional expenditures do not enlarge the scope of construction and if such expenditures are approved by the Special Committee. Amounts in excess of $50 million must be charged against the limitation on donations to Hammer-affiliated charities.

(9) Occidental shall be entitled to receive 50% of any consideration received in excess of a $55 million option price for the Museum property or 50% of any consideration the Museum receives from the assignment or transfer of its option or lease to a third party.

(10) Plaintiffs' attorneys' fees in the *Sullivan* action shall not exceed $1.4 million.

The Court of Chancery directed that for settlement purposes, the *Sullivan* action would be maintained as a stockholder derivative action and as a class action. The action was to be maintained by those plaintiffs, as representatives of the class who held Occidental common stock on April 6, 1989, and their successors in interest up to and including January 2, 1990, excluding the defendants and members of their immediate families. A settlement hearing was scheduled for April 4, 1990.[21] The Notice of Pendency of Class and Derivative Action, Proposed Settlement, Settlement Hearing and Right to Appear, was sent to all class members one month prior to the hearing.

In presenting their opposition, the Objectors relied upon the discovery which had been authorized prior to the 1990 hearing on the Settlement, as well as the discovery that had been taken with respect to their 1989 motion for a preliminary injunction. That discovery included answers to interrogatories and responses to requests for the production of documents. That discovery also included the depositions of Dr. Hammer; Daniel N. Belin; Senator Albert Gore, Sr., the acting Chairman of the Special Committee; Ronald Asquith, Vice President of Occidental with the responsibility of overseeing the construction of the park-

**21.** On June 6, 1990, after the case had already been taken under advisement, the Court of Chancery was informed that the Notice of the Settlement Hearing was not sent to a number of shareholders because of an oversight. The Court of Chancery directed that notice be sent to those stockholders. Supplemental notice was sent on June 15, 1990 providing that any additional objections to the Settlement could be filed up to July 16, 1990. In response to that notice only two letters were received, neither of which asserted any new basis for an objection.

ing garage and art museum facilities; and Hillary Gibson, the Director of Development of the Museum, who was responsible for raising funds for its continuing public support. In addition, William Prickett, Esquire ("Prickett"), counsel for Sullivan and Brody, was deposed twice, once in the *Sullivan* action and once in the *Kahn* action.

On April 4, 1990, the settlement hearing in the *Sullivan* action was held.[22] A number of shareholders appeared or wrote letters objecting to the Settlement. The Objectors argued that the decision of the Special Committee on February 16 to approve the charitable donation to fund the Museum proposal was neither informed nor deliberate and was not cured by any subsequent conduct. Therefore, the Objectors argued that the actions by the Special Committee were not entitled to the protection of the business judgment rule. The Objectors also argued that the charitable donation to the Museum proposal constituted a waste of Occidental's corporate assets. Consequently, in view of the merits of the claims being compromised, the Objectors submitted that the benefits of the proposed Settlement in the *Sullivan* action were inadequate.

On August 7, 1990, the Court of Chancery found the Settlement to be reasonable under all of the circumstances. The Court of Chancery concluded that the claims asserted by the shareholder plaintiffs would likely be dismissed before or after trial. While noting its own displeasure with the Settlement, the Court of Chancery explained that its role in reviewing the proposed Settlement was restricted to determining in its own business judgment whether, on balance, the Settlement was reasonable.[23] The Court opined that although the benefit to be received from the Settlement was meager, it was adequate considering all the facts and circumstances.

### Standard of Review

The Objectors argue that the Court of Chancery erroneously concluded that the Settlement was fair, reasonable and adequate to protect the interests of the shareholders of Occidental. "In analyzing such arguments, this Court has always been assiduous in distinguishing between the function and legal obligations imposed upon the Court of Chancery in initially reviewing a proposed settlement and the appropriate appellate standards by which this Court must subsequently examine such a decision." *Nottingham Partners v. Dana*, Del.Supr., 564 A.2d 1089, 1101–02 (1989). Those separate and distinct legal principles are both well established. *Id.* at 1102 (citing *Rome v. Archer*, Del.Supr., 197 A.2d 49, 53–54 (1964); *Polk v. Good*, Del.Supr., 507 A.2d 531, 535–36 (1986)).

Delaware law, as a general proposition, favors the voluntary settlement of contested issues. *Id.* "However, the settlement of a class action is unique in that, 'because of the fiduciary character of a class action, the Court of Chancery must

---

**22.** In the interim, the Special Committee met on March 29, 1990 to consider a request to approve the expenditure of an additional ten million dollars on the construction of the Museum. Prior to the meeting, the Committee had received documents relating to the construction, including Occidental's March 7, 1990 construction budget. During the meeting, Morris James was present to advise the Committee. Following a report given by the Occidental officer in charge of the Museum construction concerning the status of the project, the expenditures up to that point, the purpose of the requested additional funds, and the basis for the cost overruns, the Special Committee approved the expenditure of the additional ten million dollars.

**23.** The Court of Chancery noted:
 Despite this Court's expressed displeasure with the settlement efforts, as set forth in its July 19, 1989 opinion in *Kahn*, the settlement now before the Court is only slightly changed from the June 3, 1989 Memorandum of Understanding.

 . . . . .

 [Therefore] ... the settlement in the Court's opinion leaves much to be desired.
 The Court's role in reviewing the proposed Settlement, however, is quite restricted. If the Court was a stockholder of Occidental it might vote for new directors, if it was on the Board it might vote for new management and if it was a member of the Special Committee it might vote against the Museum project. But its options are limited in reviewing a proposed settlement to applying Delaware law to the facts adduced in the record and then determining in its business judgment whether, on balance, the settlement is reasonable.

participate in the consummation of a settlement to the extent of determining its intrinsic fairness.'" *Id.* (quoting *Rome v. Archer*, 197 A.2d at 53). In determining the fairness of a settlement, the Court of Chancery is not required to afford the parties an opportunity to have a trial on the merits of the issues presented. *Id.* Nevertheless, the approval of a class action settlement by the Court of Chancery does require more than a cursory scrutiny of the issues presented. *Id.* The balance between these two extremes has been described as follows:

> Under *Rome*, the [Court of Chancery's] function is to consider the nature of the [plaintiff's] claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors.

*Polk v. Good*, 507 A.2d at 535 (citing *Rome v. Archer*, 197 A.2d at 53). "If, in the light of these matters, the Court of Chancery approves the settlement as reasonable through the exercise of sound business judgment, its function as the so-called third party to the settlement has been discharged." *Nottingham Partners v. Dana*, 564 A.2d at 1102 (quoting *Rome v. Archer*, 197 A.2d at 53–54).

In an appeal from the Court of Chancery, following the approval of a settlement of a class action, the function of this Court is more limited in its nature. *Id.; see also Polk v. Good*, 507 A.2d at 536. This Court does not review the record to determine the intrinsic fairness of the settlement in light of its own business judgment. *Nottingham Partners v. Dana*, 564 A.2d at 1102. This Court reviews the record "solely for the purpose of determining whether or not the Court of Chancery abused its discretion by the exercise of its business judgment." *Id.* (citing *Polk v. Good*, 507 A.2d at 536).

Although the applicable standard of appellate review requires this Court to consider the entire record, "if the findings and conclusions of the trial judge are supported by the record and [are] the product of an orderly and logical deductive process, they will be accepted." *Id.* (citing *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972)). Consequently, for this Court to set aside a settlement which has been found by the Court of Chancery to be fair and reasonable, the evidence in the record must be so strongly to the contrary that the approval of the settlement constituted an abuse of discretion. *Id.* (citing *Rome v. Archer*, 197 A.2d at 54).

*Claims and Defenses*

Initially, we will review the Court of Chancery's examination of the nature of the shareholder plaintiffs' claims and the possible defenses thereto, in the context of the legal and factual circumstances presented. The proponents of the Settlement argued that the business judgment rule could undoubtedly have been invoked successfully by the defendants as a complete defense to the shareholder plaintiffs' claims. The business judgment rule "creates a presumption 'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.'" *Polk v. Good*, 507 A.2d at 536 (quoting *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984)). The Objectors presented several alternative arguments in support of their contention that the shareholder plaintiffs would have been able to rebut the defense based on the protection which the presumption of the business judgment rule provides. Each of those arguments was based, at least in part, upon this Court's decision in *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858 (1985).

First, the Objectors submitted that the business judgment rule would probably not protect the actions of the Special Committee because the independence of the Special Committee was questionable. In support of that argument, the Objectors assert that at least four members of the Special Committee had close ties to Dr. Hammer and

personal business dealings with him.[24] After examining the record, the Court of Chancery found that the Objectors had not established any facts that the Special Committee had any self-interest in the transaction either from a personal financial interest or from a motive for entrenchment in office. *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 188 (1988). The Court of Chancery also concluded that there was no evidence in the record indicating that any of the members of the Special Committee were in fact dominated by Dr. Hammer or anyone else.

Second, in a related argument, the Objectors argued that the presumption of the business judgment rule would have been overcome because the Special Committee proceeded initially without retaining independent legal counsel. In fact, that was a concern identified by the Court of Chancery in its July 19, 1989 opinion. However, in approving the Settlement, the Court of Chancery noted that the Special Committee had retained independent counsel, and "subsequently, and for the first time, formally approved the challenged charitable contributions." Thus, the Court of Chancery specifically found that the Special Committee had the advice of independent legal counsel before it finally approved the Museum proposal.

In this appeal, with respect to the aforementioned finding, the Objectors submit that the Court of Chancery's eventual approval of the Settlement was based upon its mistaken belief that a major judicial concern, i.e., the failure of the Special Committee to retain independent counsel prior to its formal approval of the Museum proposal, had been rectified. In particular, the Objectors contend that the Special Committee formally approved the Museum proposal at its July 20, 1989 meeting. The parties all agree that the Special Committee retained its independent legal counsel on August 4, 1989. Therefore, the Objectors argue that the Court of Chancery's conclusion that the business judgment rule would apply was based upon an erroneous premise.

In response to that argument by the Objectors, the proponents of the Settlement submit the record reflects that the Special Committee reviewed and ratified all of its prior actions on September 20, 1989, after retaining independent legal counsel. Accordingly, the proponents of the Settlement contend that, whether the September 20, 1989 action by the Special Committee is characterized as the first final approval of the Museum proposal or as a re-approval of its action taken on July 20, 1989, the Special Committee's ultimate decision to proceed with the Museum proposal was based upon the advice of independent counsel.

The Objectors' third argument in the Court of Chancery, challenging the viability of the business judgment rule as a successful defense, was based upon *Van Gorkom* and contended that the Special Committee and other directors were grossly negligent in failing to inform themselves of all material information reasonably available to them.[25] Thus, the Objectors argued that even if, *arguendo,* the Special Committee was itself independent and formally approved the Museum proposal after its retention of independent legal counsel, such approval would not have cured the Special Committee's prior failure to exercise due care. The Court of Chancery found the record showed that the Special Committee had given due consideration to the Museum proposal and rejected the Objectors' argument to the contrary. *See generally Smith v. Van Gorkom,* Del. Supr., 488 A.2d 858 (1985).

**24.** In support of its position, the Objectors noted: Senator Gore had been an Occidental employee, including Executive Vice President of Occidental, for many years; Louis Nizer is a member of a law firm which derives a substantial percentage of its annual income from Occidental; Arthur Krim was a partner and is now of counsel to that same law firm; and George O. Nolley was the founder of the Permian Corporation which was purchased by Occidental.

**25.** The Objectors submit that, *inter alia,* the Special Committee was apparently uninformed as to potential tax consequences of the charitable donation, the value of the Art Collection, how much of the Art Collection had been purchased with donations from Occidental, and what the cost for the Museum's rent-free use of the property would be to Occidental.

The Court of Chancery carefully considered each of the Objectors' arguments in response to the merits of the suggested business judgment rule defense. It concluded that if the *Sullivan* action proceeded, it was highly probable in deciding a motion to dismiss, a motion for summary judgment, or a post-trial motion, the actions of "the Special Committee would be protected by the presumption of propriety afforded by the business judgment rule." Specifically, the Court of Chancery concluded that it would have been decided that the Special Committee, comprised of Occidental's outside directors, was independent and made an informed decision to approve the charitable donation to the Museum proposal. These conclusions by the Court of Chancery are supported by the record and are the product of an orderly and logical deductive process. *Barkan v. Amsted Industries Inc.*, Del.Supr., 567 A.2d 1279, 1284 (1989); *Nottingham Partners v. Dana*, 564 A.2d at 1102; *Polk v. Good*, 507 A.2d at 536; *cf. Rome v. Archer*, 197 A.2d at 54.

■ Following its analysis and conclusion that the business judgment rule would have been applicable to any judicial examination of the Special Committee's actions, the Court of Chancery considered the shareholder plaintiffs' claim that the Board and the Special Committee's approval of the charitable donation to the Museum proposal constituted a waste of Occidental's corporate assets. In doing so, it recognized that charitable donations by Delaware corporations are expressly authorized by 8 *Del.C.* § 122(9). It also recognized that although § 122(9) places no limitations on the size of a charitable corporate gift, that section has been construed "to authorize any reasonable corporate gift of a charitable or educational nature." *Theodora Holding Corp. v. Henderson*, Del.Ch.,

257 A.2d 398, 405 (1969). Thus, the Court of Chancery concluded that the test to be applied in examining the merits of a claim alleging corporate waste "is that of reasonableness, a test in which the provisions of the Internal Revenue Code pertaining to charitable gifts by corporations furnish a helpful guide." *Id.* We agree with that conclusion.

The Objectors argued that Occidental's charitable contribution to the Museum proposal was unreasonable and a waste of corporate assets because it was excessive.[26] The Court of Chancery recognized that not every charitable gift constitutes a valid corporate action. Nevertheless, the Court of Chancery concluded, given the net worth of Occidental, its annual net income before taxes, and the tax benefits to Occidental, that the gift to the Museum was within the range of reasonableness established in *Theodora Holding Corp. v. Henderson*, Del.Ch., 257 A.2d 398, 405 (1969). Therefore, the Court of Chancery found that it was "reasonably probable" that plaintiffs would fail on their claim of waste. That finding is supported by the record and is the product of an orderly and logical deductive process. *Barkan v. Amsted Industries Inc.*, 567 A.2d at 1284; *Nottingham Partners v. Dana*, 564 A.2d at 1102; *Polk v. Good*, 507 A.2d at 536; *cf. Rome v. Archer*, 197 A.2d at 54.

### Adequacy of the Settlement

■ In examining the Settlement, the Court of Chancery applied the analysis set forth by this Court in *Rome* and its progeny. First, the Court of Chancery evaluated not only the nature of the shareholder plaintiffs' claims but also the possible defenses to those claims. In weighing the validity of the claims and the benefits provided by the Settlement, it was neither

26. The Objectors also argued that the Museum project duplicated facilities previously funded by Occidental; served no social need; was designed primarily to enhance the personal reputation of Dr. Hammer; and resulted in damage (not good will) to Occidental. The Court of Chancery concluded that these concerns were ones about which reasonable minds could differ. That conclusion is also supported by the

record and is the product of an orderly deductive process. *Levitt v. Bouvier*, 287 A.2d at 673. Therefore, we find no abuse of discretion by the Court of Chancery with respect to its assessment of these claims. *General Foods Corp. v. Cryo-Maid, Inc.*, Del.Supr., 198 A.2d 681, 685 (1964), *overruled on other grounds, Pepsico, Inc. v. Pepsi Cola Bottling Co.*, Del.Supr., 261 A.2d 520 (1969).

necessary nor desirable for the Court of Chancery to try the case or to definitively decide the merits of any of the issues.[27] *Nottingham Partners v. Dana* 564 A.2d at 1102; *Polk v. Good,* 507 A.2d at 536; *Rome v. Archer,* 197 A.2d at 53. Nevertheless, the Objectors were permitted to take discovery for the purpose of developing a record to support their contentions. After carefully evaluating the parties' respective legal positions, the Court of Chancery opined that "the [shareholder plaintiffs'] potential for ultimate success on the merits [in the *Sullivan* action] is, realistically, very poor." [28]

Second, in accordance with the procedures set forth in *Rome,* after considering the legal and factual circumstances of the case *sub judice,* the Court of Chancery examined the value of the Settlement. The proponents of the Settlement argued that the monetary value of having the Museum building called the "Occidental Petroleum Cultural Center Building" was approximately ten million dollars. The Court of Chancery noted that, in support of their valuation arguments, the proponents also argued that the Settlement: (1) reinforced and assured Occidental's identification with and meaningful participation in the affairs of the Museum; (2) reinforced and protected the charitable nature and consequences of Occidental's gifts by securing the prompt delivery and irrevocable transfer of the Art Collection to the Museum; (3) imposed meaningful controls upon the total construction costs that Occidental will pay, which had already forced the reduction of the construction budget by $19.4 million; (4) placed meaningful restrictions upon Occidental's future charitable donations to "Hammer" affiliated entities and avoided increases in posthumous payments to the Foundation or any other designated recipient after Dr. Hammer's death; (5) restored to Occidental an equitable portion of any appreciation of the properties in the event the Museum exercised its option and disposed of the properties or transferred its option for value; and (6) guaranteed that the Art Collection would continue to be located in the Los Angeles area and remain available for the enjoyment of the American public rather than dissipated into private collections or sold abroad.

The Court of Chancery characterized the proponents' efforts to quantify the monetary value of most of the Settlement benefits as "speculative." The Court of Chancery also viewed the estimate that naming the building for Occidental would have a ten million dollar value to Occidental with "a good deal of skepticism." Nevertheless, the Court of Chancery found that Occidental would, in fact, receive an economic benefit in the form of good will from the charitable donation to the Museum proposal. It also found that Occidental would derive an economic benefit from being able to utilize the Museum, adjacent to its corporate headquarters, in the promotion of its business.

■ Finally, the Court of Chancery applied its own independent business judg-

---

**27.** In determining the fairness of a settlement, there is no requirement that the parties be given an opportunity to have a trial. To do so would defeat the basic purpose of the settlement of litigation. *Rome v. Archer,* 197 A.2d at 53.

**28.** In support of their arguments based upon the business judgment rule, the Objectors relied upon this Court's decision in *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985). However, in the case *sub judice,* the attorney for the shareholder plaintiffs who agreed to the Settlement, Prickett, was the same attorney who represented the successful shareholder plaintiffs in *Van Gorkom.* In reviewing the Objectors' prospects for success, in reliance upon *Van Gorkom* in this litigation, the Court of Chancery had before it the deposition testimony of Prickett which outlined his assessment of the procedural and substantive obstacles which contributed to the shareholder plaintiffs' decision to enter into the Settlement. According to the brief filed by Prickett in this appeal, those obstacles included: the fact that the shareholder plaintiffs faced a motion to stay discovery and a motion to dismiss, raising the prospect that the *Sullivan* action might be dismissed without any discovery; the shareholder plaintiffs' disclosure claim had been mooted; there was a strong possibility that the demand requirement of Court of Chancery Rule 23.1 or the application of the business judgment rule would cause dismissal of the *Sullivan* action; and proving a breach of the duty of care and/or the corporate waste claims relating to a charitable contribution would be extremely difficult.

ment in deciding whether the Settlement was fair and reasonable. In doing so, the Court of Chancery was called upon to function in its special role as the so-called third party to the Settlement. *Barkan v. Amsted Industries Inc.*, 567 A.2d at 1283–84; *Nottingham Partners v. Dana*, 564 A.2d at 1102 (quoting *Rome v. Archer*, 197 A.2d at 53–54). This required it to balance the policy preference for settlement against the need to insure that the interests of the shareholders, as a class, had been fairly represented. *Barkan v. Amsted Industries, Inc.*, 567 A.2d at 1283 (citing *Rome v. Archer*, 197 A.2d at 53).

■ In discharging its special role in the case *sub judice*, the Court of Chancery properly evaluated the value of the Settlement in the context of the strength of the claims which were being compromised. *Nottingham Partners v. Dana*, 564 A.2d at 1103. As this Court stated in *Barkan v. Amsted Industries, Inc.*, 567 A.2d at 1285:

> The strength of claims raised in a class action lawsuit helps to determine whether the consideration received for their settlement is adequate and whether dismissal with prejudice is appropriate. Thus, if the [Court of Chancery] were to find that the plaintiff class was being asked to sacrifice a facially credible claim for a small consideration, he would be justified in rejecting a settlement as unfair. Conversely, where the [Court of Chancery] finds that the plaintiff's potential challenges have little chance of success, he has good reason to approve the proposed settlement.

The Court of Chancery found that "the benefit [of the Settlement] to the stockholders of Occidental is sufficient to support the Settlement and is adequate, if only barely so, when compared to the weakness of the plaintiffs' claims." The Court of Chancery concluded that "although the Settlement is meager, it is adequate considering all the facts and circumstances."

■ "[W]hen the Court of Chancery reviews the fairness of a settlement, it must evaluate all of the circumstances of the settlement by using its own business judgment." *Barkan v. Amsted Industries,*

*Inc.*, 567 A.2d at 1284. The Court of Chancery's broad special role contrasts sharply with this Court's own limited one. Because the Court of Chancery's decision constitutes an exercise of discretion, this Court reviews the record simply to determine whether that discretion has been abused. *Polk v. Good*, 507 A.2d at 536. "We do not exercise our own business judgment in an effort to evaluate independently the intrinsic fairness of the settlement." *Barkan v. Amsted Industries, Inc.*, 567 A.2d at 1284. "Because the Court of Chancery is in the best position to evaluate the factors that support a settlement, we will not second-guess its business judgment upon appeal." *Id.* "Rather, if the findings and conclusions of the Court of Chancery 'are supported by the record and are the product of an orderly and logical deductive process, they will be accepted' and the decision will be affirmed." *Id.* (quoting *Levitt v. Bouvier*, 287 A.2d at 673). The Court of Chancery's decision to approve the Settlement in the *Sullivan* action is supported by the record and is the product of an orderly and logical deductive process.

### Conclusion

■ The reasonableness of a particular class action settlement is addressed to the discretion of the Court of Chancery, on a case by case basis, in light of all of the relevant circumstances. *Evans v. Jeff D.*, 475 U.S. 717, 742, 106 S.Ct. 1531, 1545, 89 L.Ed.2d 747, *reh'g denied*, 476 U.S. 1179, 106 S.Ct. 2909, 90 L.Ed.2d 995 (1986). In this case, we find that all of the Court of Chancery's factual findings of fact are supported by the record. We also find that all of the legal conclusions reached by the Court of Chancery were based upon a proper application of well established principles of law. Consequently, we find that the Court of Chancery did not abuse its discretion in deciding to approve the Settlement in the *Sullivan* action. *Barkan v. Amsted Industries, Inc.*, 567 A.2d at 1285; *Nottingham Partners v. Dana*, 564 A.2d at 1104; *Polk v. Good*, 507 A.2d at 536–39; *Rome v. Archer*, 197 A.2d at 58. Therefore, the decision of the Court of Chancery is AFFIRMED.

## ORDER

This 9th day of July, 1991, it appears to the Court that:

1) Dr. Armand Hammer, a defendant below and one of the appellees in the above-captioned appeal, died on December 10, 1990 while the said appeal was pending.

2) On January 29, 1991, the appellants filed a motion to substitute the personal representative of the estate of Dr. Armand Hammer in place of Dr. Armand Hammer as a defendant-appellee in this matter.

3) On or about June 20, 1991, Michael Hammer was appointed Special Administrator of the estate of Armand Hammer, with powers of a general administrator, by the Superior Court of California, County of Los Angeles, Central Branch.

4) On July 5, 1991, Michael Hammer, in his capacity as Special Administrator of the estate of Armand Hammer, filed (i) a suggestion of death in this Court regarding the late Dr. Armand Hammer, pursuant to Supreme Court Rule 31; (ii) a statement that he had no objection to the substitution of Michael Hammer, Special Administrator of the estate of Armand Hammer, as a defendant-appellee in place of Dr. Armand Hammer; and (iii) designated Young, Conaway, Stargatt & Taylor as his attorneys in the above-captioned appeal.

5) On July 9, 1991, Bruce M. Stargatt, Esquire and Edward B. Maxwell, 2nd, Esquire, Young, Conaway, Stargatt & Taylor, of Wilmington, Delaware, with Bruce W. Kauffman, Esquire and Stephen J. Mathes, Esquire, Dilworth, Paxson, Kalish & Kauffman, of Philadelphia, Pennsylvania, of counsel, entered an appearance for Michael Hammer, Special Administrator of the estate of Armand Hammer.

6) On July 9, 1991, the attorneys for Michael Hammer, Special Administrator for the estate of Armand Hammer, notified this Court that their client adopts the position taken on appeal by Dr. Armand Hammer prior to his death and that, consequently, their client does not desire supplemental briefing or argument before this Court renders its decision in this matter.

NOW, THEREFORE, IT IS HEREBY ORDERED that Michael Hammer, in his capacity as Special Administrator of the estate of Dr. Armand Hammer, is hereby substituted for Dr. Armand Hammer, as a defendant-appellee in this consolidated appeal.

IT IS FURTHER ORDERED that the caption in this consolidated appeal is hereby amended henceforth to be as follows:

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ALAN R. KAHN, BARNETT STEPAK, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | § § § |
| | § Nos. 301, 312, 313, 1990 |
| | § (Consolidated) |
| Objectors Below, | § Court Below: Court of Chancery |
| Appellants, | § of the State of Delaware, in |
| v. | § and for New Castle County |
| | § C.A. No. 10823 |
| JOSEPH SULLIVAN and ALAN BRODY, | § § |
| | § |
| Plaintiffs Below, | § |
| | § |
| MICHAEL HAMMER, Special Administrator of the Estate of DR. ARMAND HAMMER, OCCIDENTAL PETROLEUM CORPORATION, DR. RAY IRANI, ARTHUR B. KRIM, MORRIE A. MOSS, AZIZ D. SYRIANI, O.C. DAVIS, SENATOR ALBERT GORE, ARTHUR GROMAN, MICHAEL A. HAMMER, DAVID A. HENTSCHEL, J. ROGER HIRL, JOHN KLUGE, LOUIS NIZER, GEORGE O. NOLLEY, DR. C. ERWIN PIPER, GERALD M. STERN, ROSEMARY TOMICH, | § § § § § § § § § § § § § § § § |
| | § |
| Defendants Below, | § § |
| THE ARMAND HAMMER MUSEUM OF ART AND CULTURAL CENTER, INC., | § § § |
| | § |
| Intervenor Below, Appellees. | § § |